Argued and submitted July 8, accused disbarred December 30, 1987

# In re Complaint as to the Conduct of
## C. ANDERSON GRIFFITH,
*Accused.*

## (OSB 85-61; SC S33097)

748 P2d 86

John R. Faust, Jr., Portland, argued the cause and filed the petition and briefs for accused. With him on the petition and briefs were Schwabe, Williamson, Wyatt, Moore & Roberts, Portland; William L. Hallmark, Portland and Emil R. Berg, Portland.

Jeffrey D. Sapiro, Portland, argued the cause and filed the petition and respondent's brief for the the Oregon State Bar. With him on the brief was William F. Schulte, Jr., Portland.

PER CURIAM

## PER CURIAM

The Oregon State Bar filed an amended complaint against C. Anderson Griffith accusing him of unethical conduct in 39 separate causes involving for the most part alleged dishonesty in business transactions and alleged conflicts of interest. The Trial Panel of the Disciplinary Board found Griffith guilty as charged in the 2nd, 27th, 28th, and 34th causes of complaint and not guilty of the balance of the causes. It "recommended" that Griffith "be permanently disbarred from the practice of law."[1]

We find that Griffith is guilty under the 2nd, 27th, 29th, 30th, 32nd, 33rd, 34th, 36th, 38th, and 39th causes of complaint and order that he be disbarred. The chief difference between this decision and that reached by the Trial Panel is that we have found Griffith violated disciplinary rules involving conflict of interest in several causes where the Trial Panel did not.

*De novo* review by this court is required. The relevant portions of ORS 9.536 provide:

"(2) If the decision of the disciplinary board is to suspend the accused attorney from the practice of law for a period of longer than 60 days or to disbar the accused attorney, the matter shall be reviewed by the Supreme Court. The procedure on review shall be as provided in the rules of procedure.

"(3) When a matter is before the Supreme Court for review, the court shall consider the matter de novo and may adopt, modify or reject the decision of the disciplinary board in whole or in part and thereupon enter an appropriate order."

Both Griffith and the Oregon State Bar have filed extensive briefs in this court. Griffith urges us to find him not guilty of all causes or in the alternative to give him a new hearing because he was able to attend only one day of the previous hearing. The Bar argues that Griffith is guilty of all causes and that he waived his appearance at the hearing. The hearing before the Trial Panel commenced on February 10, 1986 and was concluded on Feburary 22, 1986. The transcript

---

[1] The Trial Panel of the Disciplinary Board is the equivalent of a trial court. It makes decisions and not recommendations. ORS 9.536.

The term "permanent" disbarment is not accurate. *See In re Eads,* 303 Or 111, 125 n 18, 734 P2d 340 (1987).

is over 2,000 pages in length. Hundreds of exhibits were received in evidence and over 50 witnesses testified. We review the entire record *de novo.*

This case is unusual in that it did not arise from the complaints of a disgruntled client or another lawyer. A series of newspaper articles concerning the collapse of the Columbia Pacific Bank sparked the Bar's investigation. All the causes in the Bar's amended complaint arise, directly or indirectly, from Griffith's association with Thomas E. Wolf, C. Dale Brookens, and Lester Hardy or from the rise and fall of Columbia Pacific Bank and the First Northwest Mortgage Company.[2]

At all material times Griffith and Wolf were partners in a law firm which included numerous other lawyers. Griffith was in the litigation section of the firm and specialized in the defense of medical malpractice claims. Wolf was the head of the business section and was recognized by the other partners as being an expert in banking and finance.

Brookens and Hardy are not and were not lawyers. They are experienced businessmen who at the beginning of their ventures with Wolf and Griffith had considerable financial assets. Both Brookens and Hardy had previous experience in the construction business and were long-standing clients of Griffith's law firm.

Columbia Pacific Bank was established in the mid-1970s. Wolf was active in forming the bank. After its formation he was a director, a member of the loan committee and secretary to the board of directors. He was also the chief legal counsel. Griffith represented the bank in some litigation matters but was not active in its day-to-day operations.

In 1978 Wolf, Griffith, Brookens and Hardy formed the mortgage company which is referred to in this proceeding as "First Northwest." Each individual paid $26,250 for 150 shares of the original capital stock. The principal business of First Northwest was to make short term construction loans to

---

[2] This company was originally incorporated in 1978 as First Beneficial Mortgage Company. Later in the same year, it changed its name to First Northwest Mortgage Company. In 1980 it changed its name to First Northwest Financial Corp. The reasons for the name changes are not relevant to this case. For convenience we will refer to it as "First Northwest."

real estate developers. At first the business was successful—between 1978 and 1983 it loaned approximately $7 million to its customers. First Northwest and its shareholders borrowed money from Columbia Pacific and Canadian Imperial Bank and then turned around and loaned it to its customers.

On May 15, 1979, Griffith and Wolf plus five of their law partners formed the "Lawyer's Retirement Trust." The seven law partners were the trustors and Wolf was the trustee. The agreement declared that the trust was for the "sole purpose of holding shares in the Columbia Pacific Bank * * * as an investment for the retirement account of the beneficiaries." The agreement also recited that the trustors were the owners of a certain number of shares of Columbia Pacific and that the trustee was authorized to purchase additional shares for their account. Griffith had a 13.5 percent interest in the trust.

By January 1980, the Lawyer's Retirement Trust had acquired 24.98 percent of the outstanding stock of Columbia Pacific. At that time a new corporation called Columbia Banshares, Inc. was formed and applied to the Federal Reserve Bank to become a bank holding company with authority to own more than 25 percent of the stock of Columbia Pacific. The application in effect stated that the holding company would be the successor to Lawyer's Retirement Trust. The application was denied by the Federal Reserve Bank.[3]

In March 1980, Brookens and Hardy acquired in their names 20,000 shares of Columbia Pacific. They then conveyed the stock to First Northwest, but the transfer was never registered on the books of Columbia Pacific. 20,000 shares represented approximately 4.89 percent of the outstanding stock of Columbia Pacific.

In July 1980, Wolf purported to sell 125 of his 150 shares in First Northwest to Griffith thereby reducing Wolf's interest in the company to approximately 4 percent. Griffith executed and delivered to Wolf a promissory note in the amount of $125,000 in payment of the alleged purchase.

---

[3] The application on behalf of Columbia Banshares, Inc. to the Federal Reserve Bank was submitted by Wolf. The incorporator of Columbia Banshares, Inc. was Wolf and the original two-person board of directors was composed of Wolf and Griffith.

Griffith also signed and gave to Wolf a blank stock power. Wolf kept the stock certificates. At the same time Wolf resigned as the secretary and as a director of First Northwest. Wolf told Griffith that the alleged sale would relieve Wolf of the obligation of reporting his interest in First Northwest in the annual report of Columbia Pacific. However, after the alleged sale, Wolf continued to be the moving force in the operations of First Northwest. Griffith did not and never intended to make any payments on the promissory note. In 1982 or 1983 Griffith requested that Wolf destroy the note. Wolf reported back to Griffith that it had been destroyed.[4]

At all material times unsecured loans from Columbia Pacific were limited by law to $421,975 to one borrower. ORS 708.305. An internal bank policy lowered this limit to $400,000. First Northwest had an unsecured line of credit at the bank in the maximum amount. The unsecured lines of credit for the shareholders of First Northwest were: Griffith $250,000, Brookens $400,000, Hardy $300,000 and Wolf zero. The individual lines of credit were used exclusively by First Northwest and were administered by an employe who made all draws, deposits and renewals as the cash was needed for loans to First Northwest's customers. By mid-1982, First Northwest and its individual shareholders had borrowed from Columbia Pacific the maximum limits of the credit lines. Although Wolf did not have an individual line of credit at Columbia Pacific, the four shareholders of First Northwest had executed a cross guarantee agreeing to be jointly liable for all loans obtained by any shareholder from any source for the benefit of the corporation.

Parts of this proceeding involve people and their business enterprises in Southern Oregon. Griffith's and Wolf's law firm represented Bear Creek Valley Bank, which had its principal place of business at Phoenix, Oregon. In

---

[4] This version of Wolf's sale of the 125 shares of First Northwest is consistent with the positions of the Bar and Griffith and the findings of the Trial Panel. However, Wolf testified in the Federal District Court that he sold the stock in a legitimate sale because he could not be a director and major stockholder in both Columbia Pacific and First Northwest. Wolf further testified that when the real estate market began to deteriorate in 1983, Griffith had second thoughts about his purchase and informed Wolf that he would not pay the promissory note. Wolf claimed that he had the note and that it would be introduced as an exhibit in the federal court. The exhibit is not available to us.

February 1980, First Northwest loaned Lester H. Brown and Patricia Brown the sum of $375,000 to develop a subdivision.[5] In December 1980, Wolf persuaded the Bear Creek Valley Bank to loan the Browns $540,000, which was used in part to pay First Northwest. A dispute developed and the Browns filed an action against First Northwest seeking damages and reformation of their agreement. Griffith represented First Northwest in this litigation. During the summer of 1981, the Browns had difficulty making the payments due Bear Creek Valley Bank and requested the bank to restructure the loan. The bank wrote to Griffith's firm seeking legal advice concerning the Browns' request. The Browns' action against First Northwest was settled in November 1981.

Wolf was the member of the law firm who helped organize the Bear Creek Valley Bank, and through his influence First Northwest provided the finances for a 16-acre tract near Medford being developed by several individuals from that area doing business as Village Joint Venture. Some of the initial members of the joint venture were officers and directors of the Bear Creek Valley Bank. By January 1982, Village Joint Venture owed First Northwest more than $1.2 million and could not pay it. First Northwest had borrowed the money from Columbia Pacific and could not meet its obligation. Griffith, Wolf and Brookens agreed to become principals in the project along with the Medford people in order to obtain more financing to complete the construction. The Central Point Development Corporation was formed with Griffith, Wolf, and Brookens holding 51 percent of the stock. The Medford people conveyed the 16 acres to Central Point Development and contributed $250,000 to the new venture. This money was used to reduce the debt of Village Joint Venture to First Northwest. Wolf, Griffith and Brookens agreed to contribute an additional $250,000 to Central Point Development but did not. The Medford individuals in Central Point Development received some reinforcements by way of local people and Griffith, Wolf and Brookens withdrew.

In the meantime, back in Portland the financial outlook for both Columbia Pacific and First Northwest looked bleak. First Northwest had a negative cash flow and a negative

---

[5] The subdivision was in Sandy, Oregon.

net worth. Central Point Development still owed it over $1 million. A bank examination in March 1982 had put Columbia Pacific under the gun and it was expecting a cease and desist order from the Federal Reserve Board that would curtail its ability to lend money. Columbia Pacific was expecting a million dollar loss for the year of 1982.

In July 1982, with Wolf at the wheel, it was arranged for Columbia Pacific to loan $1.1 million to the reconstituted Medford group involved in Central Point Development. To skirt the bank's lending limits two new shell entities were created solely for the transaction. They were Rogue Valley Development Group and Kingsland Manor. The loan was then split into three parts. Central Point Development and the two shell corporations did not directly receive any of the proceeds from the loan. It was credited to First Northwest which in turn applied it to reduce the credit lines at Columbia Pacific. The Board of Directors of the bank did not learn about the loan until approximately two months after the fact. The bank president who arranged the loan for Wolf resigned on the day the directors received the information.

Included in the $1.1 million loan received by First Northwest from Columbia Pacific via Central Point Development and associated companies was $52,385. This sum represented attorney fees due Wolf's and Griffith's law firm by Central Point Development's predecessors in interest in the 16-acre project, which had been added to the loan balance in October 1981. After the loan had been closed, the Medford group disputed the charge. Griffith arranged to have First Northwest refund $25,000. The balance of $27,385 was not refunded or paid to Griffith's law firm.

In February 1983, an examination by the Federal Reserve Bank found Columbia Pacific to be insolvent. The Oregon Superintendent of Banks closed Columbia Pacific on March 18, 1983. At that time the lines of credit to First Northwest and its individual shareholders were in default. In addition to his $250,000 line of credit, Griffith was also in default on two additional loans in the amounts of $76,672 and $25,000. He was also liable on his guarantee for the delinquent loans of First Northwest, Brookens and Hardy at Columbia Pacific in excess of $1 million. Griffith was heavily in debt to other financial institutions.

On March 19, 1983, Griffith and his wife separated. On that date they entered into a property settlement agreement. It provided that the parties' residence should be awarded to the husband and that he pay the wife $50,000 for her equity. It also provided that their automobiles should be awarded to the wife and that the husband should pay the wife's debt at Columbia Pacific Bank in the approximate sum of $18,000. On March 24, 1983, the parties filed a co-petition for the dissolution of their marriage. A decree was entered on the same date. In June 1983, the parties resumed living together.

In February 1983, Griffith, Wolf, Brookens and First Northwest were partners in Trans West Transport Group which had been formed for the purpose of chartering aircraft. The partnership had previously purchased from Flightcraft, Inc. a Beech King Air B200. The balance due in February 1983 was $1,578,967. Trans West was in default. Brookens was a 10 percent limited partner but Wolf, as attorney-in-fact, had signed Brookens' name as a guarantor for the entire debt.

An agreement was reached between the parties concerning the refinancing of the debt for the airplane. The monthly payments were reduced from $23,393 to $16,447. The personal guarantees by the partners were released, but Brookens conveyed to Trans West a tract of land in Woodland, Washington which he estimated to be worth $500,000. Trans West in turn mortgaged the property to Flightcraft as security for the debt.[6] In April 1983, Trans West returned the airplane to the seller and received a credit of $1,200,000 on the debt. Later Brookens was required to pay Flightcraft approximately $100,000 to secure the release of the Woodland property.

On July 12, 1985 the Oregon State Bar filed its formal complaint against Griffith. From September 11, 1985 through December 17, 1985, the Bar and Griffith conducted depositions and exchanged discovery requests.

On December 20, 1985, the Bar filed its amended

---

[6] At one time the airplane was financed with Beech Acceptance Corp. That fact is immaterial to our consideration because Flightcraft remained as the responsible party. The negotiations after the debt was in default were between Trans West and Flightcraft.

formal complaint accusing Griffith of unethical conduct in 39 separate causes. Griffith filed an answer which admitted certain factual allegations but denied misconduct. The answer affirmatively alleged that the Bar had failed to follow statutory and procedural requirements governing the discipline of lawyers and that this failure required dismissal of the amended complaint.

On November 11, 1985, the Trial Panel set the hearing on the charges to begin on February 10, 1986. Griffith filed a motion on February 7, 1986, requesting a continuance. The motion was denied. The hearing was held from February 10 through February 22, 1986. Griffith was represented by counsel throughout the hearing, but he attended only the last day in person. The Trial Panel ruled against Griffith on his affirmative defense. It found Griffith guilty of four causes of complaint and dismissed the other 35 causes. By way of sanction the trial panel "recommended" that Griffith be "permanently disbarred."

Griffith's petition for review in this court set out five assignments of error, asserting that the Trial Panel erred in finding him guilty on four causes of complaint and in denying his motion for a continuance.[7]

The Bar's brief in this court in effect asserts that the Trial Panel was correct in finding Griffith guilty of the four causes of complaint but that it erred in finding him not guilty of the other causes.

Under our *de novo* review, ORS 9.536(3) *supra,* we first consider Griffith's motion for a continuance and his affirmative defense. Next, we shall review the 39 separate causes in numerical order. We conclude the opinion by discussing the proper sanction.

## MOTION FOR CONTINUANCE

Griffith's brief in this court presents the continuance issue in this manner:

"Did the Trial Panel err in denying Griffith's motion for continuance of the hearing when the denial deprived him of

---

[7] Griffith's brief also lists three additional contentions under the heading of "OTHER ERRORS." We will consider them after our discussion of Griffith's "Affirmative Defense." See pp 21-23.

the opportunity to be personally present to confront the witnesses against him, to assist his counsel, and to otherwise participate in any part of the two week hearing except for the one Saturday when he was himself examined as a witness?"

In August 1985, Griffith and the other lawyers involved in a medical malpractice case in Deschutes County stipulated to a February 10, 1986 trial date for that case. On November 1, 1985 the Trial Panel set the hearing in this disciplinary matter for February 10, 1986.[8] At first Griffith did not try to have the medical malpractice case reset. He later explained in an affidavit that he thought he could handle the conflict in one of three ways: (1) the medical malpractice case was likely to be settled; (2) if it was not settled, he might be able to settle with the Oregon State Bar; and (3) if not, he could have another lawyer from his office try the malpractice case.

On February 4, 1986, Griffith discovered that his doctor client would not consent to having one of the other lawyers in Griffith's office defend the malpractice case. The doctor insisted that Griffith personally try the case. Griffith unsuccessfully tried to have the Deschutes County case reset. On February 5, 1986, Griffith requested that the hearing in this matter be continued. Griffith's counsel renewed the motion on February 10th. Griffith defended the malpractice case and the hearing in this matter proceeded without him except for Saturday, February 22, when he testified.

In this court Griffith contends that the denial of his motion for a continuance (1) effectively denied his statutory and constitutional rights of due process to be present during his hearing, and (2) was an abuse of discretion not supported by the rationale of the Trial Panel.

---

[8] The Trial Panel was aware that the medical malpractice case had previously been set for trial. The transcript of the November 1, 1985 proceeding contains the following:

"MR. RANSOM (Griffith's attorney): * * * I would like to have the [Trial Panel] clothed with the authority to call various judges, like in Deschutes County, and say Andy Griffith won't be there for trial in the case set for February 10th.

"MR. BROOKE [Trial Panel Chairman]: To the extent we can accommodate, we will, okay.

"MR. RANSOM: Andy has trials basically across the board until May and that's going to have to happen."

Griffith claims that he had the pre-trial responsibility in this case to "obtain and review the thousands of pages of documentary evidence and depositions which are critical to the issues in this case." Therefore, requiring the hearing without Griffith present not only denied him the right to confront his accusers, it also prevented his lawyer, John Ransom, from effectively conducting the defense.

In support of his due process argument Griffith relies upon ORS 9.534(2); Article 1, section 10, of the Oregon Constitution; the 14th Amendment to the United States Constitution; *Illinois v. Allen,* 397 US 337, 90 S Ct 1057, 25 L Ed 2d 353 (1970); *Snyder v. Commonwealth of Massachusetts,* 291 US 97, 54 S Ct 330, 78 L Ed 674 (1934); *In re the Matter of Houts, III,* 7 Wash App 476, 499 P2d 1276 (1972).

This court has previously recognized that the suspension from the practice of law is a deprivation of liberty or property within the meaning of due process. *State ex rel Robeson v. Oregon State Bar,* 291 Or 505, 512, 632 P2d 1255 (1981). However, due process does not require that a lawyer personally attend a hearing to suspend his right to practice under all circumstances. *In re Ankelis,* 164 Or 676, 103 P2d 715 (1940). The cases relied upon by Griffith are distinguishable from this matter—*Allen* and *Snyder* are cases involving the rights of a criminal defendant and *Houts* is a juvenile court matter.

ORS 9.534(2) provides:

"A member, formally accused of misconduct by the bar, shall be given reasonable written notice of the charges against the member, a reasonable opportunity to defend against the charges, the right to be represented by counsel, and the right to examine and cross-examine witnesses. The member shall also have the right to appear and testify, and the right to the issuance of subpenas for attendance of witnesses and the production of books, papers or documents in the defense of the member."

In *In re Ankelis, supra,* the accused lawyer was charged with unethical conduct on grounds that he had been convicted of three crimes in U.S. District Courts. Counsel for the accused argued that the trial committee should have postponed the hearing on the charges against Ankelis because he was confined to the federal penitentiary and unable to

attend the hearing. The trial committee took the position "that Ankelis had been afforded an opportunity to be present, in that he had been served with a copy of the charge against him and given notice of the time and place of the hearing" under section 32-126, Oregon Code Annotated (Supp 1935).[9] In this court Ankelis urged that the construction placed upon that statute by the trial committee rendered it unconstitutional "as depriving the accused of a property right without due process of law" by denying him the right to be present in person at the hearing. This court "permanently disbarred" Ankelis and said:

> "The disbarment of an attorney at law is not a criminal action but is a proceeding *sui generis. State ex rel. v. Arnold,* 145 Or 634, 639, 28 P.2d 846. There is no provision in either the state or the federal constitution which assures to an attorney the right to be present in person in proceedings for his disbarment. The imprisonment of Ankelis could not prevent the institution of proceedings against him or require postponement of the hearing. * * *. His inability to be present in person at the hearing was one of the consequences of his commission of crime."

164 Or at 687.[10]

*In re Ankelis, supra,* is relevant to this matter because it demonstrates that due process does not require that the accused lawyer be personally present at a discipline hearing. Ankelis was tried under section 32-126, Oregon Code Annotated Supp (1935). The current version is ORS 9.534(2), *supra.* There have been no substantial changes. Both statutes provide that the accused lawyer shall have a reasonable opportunity to defend against the charges. Here the Bar complied

---

[9] Section 32-126, Oregon Code Annotated (Supp 1935) provided:

"Any person complained against, as herein provided, shall be given reasonable written notice and a copy of the charge against him and have a reasonable opportunity and right to defend against the charge by the introduction of evidence and the right to be represented by counsel, and to examine and cross-examine witnesses. He also shall have the right to the issuance of subpoenas for attendance of witnesses to appear and testify or produce books and papers, as above provided."

[10] The above portion of *In re Ankelis,* 164 Or 676, 687, 103 P2d 715 (1940), was quoted with approval in this court's later opinion in *State ex rel Gladden v. Sloper,* 209 Or 346, 306 P2d 418 (1957). In the later case it was held that a prisoner's due process rights under the 14th amendment would not be violated if he was not allowed to attend a hearing and defend a divorce complaint filed against him by his wife in the Marion County Circuit Court.

with ORS 9.534(2) and gave Griffith a reasonable opportunity personally to defend the charges. He voluntarily chose not to attend except for the last day of the hearing. He was ably represented by counsel of his choice during the entire proceeding. In effect Griffith waived his right to be personally present.

■■ Whether the Trial Panel abused its discretion when it denied Griffith's motion for a continuance is a separate question.

On February 5, 1986, Griffith and his lawyer met with the chairman of the Trial Panel at the latter's office. Griffith requested a continuance because of the conflict on trial dates with the Deschutes County medical malpractice case. Apparently that meeting was not reported. On February 10, Griffith's lawyer moved on the record for a continuance. The chairman of the Trial Panel ruled as follows:

"This hearing has been set now, I think, for two months.

"That was well-known to Mr. Griffith, and from what I remember at that meeting on the 5th, he had not kept the court in Deschutes County informed and thought the case was going to settle or somehow go away, or this proceeding was going to go away, and it was only in the last minute that he found he was in a predicament. And we can't delay this thing because of the rules under which disciplinary panels are convened, and hearings have to go forward. So I'm going to deny the motion for a continuance, and we're going to proceed."

. In this court Griffith claims that "the only substantial reason" given by the chairman for denying the continuance was "that the deadline set by the Bar's rules would not allow a continuance." He argues that the chairman was mistaken because the rules do allow a continuance. Griffith refers to BR 5.4 which provides:

"The hearing date shall be established by the trial panel chairperson as provided in BR 2.4(h). Continuances of the hearing date may be granted by the trial panel chairperson at any time prior to the hearing, or by the trial panel, at the time of the hearing, only upon a showing of good cause therefor; but in no event shall continuances granted the Bar or the accused exceed 56 days in the aggregate."

BR 2.4(h) provides that the hearing date shall be set not less than 42 days nor more than 91 days from the time the

pleadings are received by the Trial Panel from the General Counsel.

The record does not disclose when the chairman in this matter received the pleadings from the General Counsel of the Bar. However, the record of the hearing on November 1, 1985, plainly shows that the chairman in setting the hearing date of February 10, 1986, took into consideration both the 91-day and the 56-day periods. We read the record to mean that the total of the two periods would have expired on March 10, 1986. Griffith answers by saying that if that is true, then the February 10th date was beyond the 91-day limit required by BR 2.4(h) and the case should be dismissed.

The failure of the Trial Panel chairman to continue the hearing was not an abuse of discretion. Under our *de novo* review we conclude that the Trial Panel chairman denied the motion because (1) Griffith had "painted himself into a corner," (2) there was no showing of good cause separate and apart from the circumstances caused by Griffith's conduct, and (3) the hearings of the Trial Panel should go forward with dispatch. If the hearing in fact was set beyond the 91-day limit provided by BR 2.4(h) there was no objection to it for that reason on the trial level.

## AFFIRMATIVE DEFENSE

Griffith's affirmative defense in effect alleged: (1) The investigation and proceedings were initiated in December 1983, pursuant to *former* ORS 9.560, and the Bar failed to follow the balance of the statutes that were applicable at that time concerning the procedures for investigation and discipline of attorneys; (2) The Bar failed to complete its investigation in a timely manner and did not obtain the proper extensions of time; and (3) The Bar failed to give Griffith a complaint in writing under BR 2.5.[11]

The 1983 legislature by enacting Chapter 618 made

---

[11] BR 2.5(a) provides in part:

*"Complaints To Be In Writing.* All complaints made against an attorney shall be in writing and shall be referred to General Counsel, who shall evaluate the information contained in the complaint.

"If the facts alleged do not raise an arguable complaint of misconduct, General Counsel shall, within 14 days * * *, dismiss the complaint and notify the complainant and the attorney in writing of the dismissal."

substantial changes in the laws relating to the discipline of attorneys. It became effective January 1, 1984, and applied to "all formal charges filed on or after that date." The first formal complaint against Griffith was filed on July 12, 1985, and therefore *former* ORS 9.560 which was repealed in Oregon Laws 1983, chapter 618, did not apply.[12]

■ In the second part of Griffith's affirmative defense, he claims that the Local Professional Responsibility Committee did not complete its investigation within 63 days as required by BR 2.5(e)(1) or apply for additional time as required by BR 2.5(e)(2) and therefore the complaint should be dismissed. This defense is answered by BR 11.1 which provides:

> "The failure of any person or body to meet any time limitation or requirement in these rules, shall not be grounds for the dismissal of any charge or objection unless a showing is made that the delay substantially prejudiced the ability of the accused or applicant to receive a fair hearing."

We agree with the Trial Panel that there is no showing by Griffith of substantial prejudice and therefore this defense fails.

■ In the third part of Griffith's affirmative defense it is claimed that the Bar failed to give him a written complaint as required by BR 2.5 (*see* note 11, *supra*). The investigation here was not initiated as a result of a written complaint by a disgruntled client or another lawyer, but was started by the Bar on its own motion following newspaper accounts of the collapse of the Columbia Pacific Bank. This part of Griffith's affirmative defense failed to take into account BR 2.3(b)(2) which provides:

> "The SPRB (State Professional Responsibility Board) shall supervise the investigation of complaints, allegations, or instances of alleged misconduct on the part of attorneys and act on such matters as it deems appropriate. A complaint by a client or other aggrieved person shall not be a prerequisite to

---

[12] BR 1.5(a) provides in part:

"These rules shall apply to all * * * disciplinary * * * proceedings initiated by the service of a formal complaint * * * on or after January 1, 1984. * * * [D]isciplinary * * * proceedings initiated by the service of a formal complaint * * * prior to January 1, 1984 shall be completed under the rules effective prior to that date. For all other purposes, these rules shall be effective January 1, 1984."

the investigation of alleged misconduct by attorneys or the institution of disciplinary proceedings against any attorney."

We agree with the Trial Panel that the third part of Griffith's affirmative defense is not well taken.[13]

## OTHER MATTERS RAISED BY GRIFFITH

Griffith's brief in this court claimed under the heading of "OTHER ERRORS" that he was prejudiced by the following:

"1. The denial of his motion to vacate the order consolidating his case with the case against Wolf.

"2. The denial of his motion for a separate hearing on sanctions pursuant to BR 5.7.

"3. The denial of his counsel's motion during the hearing to continue the hearing until Griffith could read the testimony of crucial witnesses and determine if further cross-examination or other additional evidence was necessary, and if so, for leave to present such additional evidence." (Footnotes omitted.)

The hearing before the Trial Panel commenced on Monday, February 10th, on the complaints against both Griffith and Wolf who were represented by different counsel. On Thursday, February 13th, the counsel for Wolf announced at the commencement of the proceedings for that day that his client was going to resign from the Oregon State Bar. This court, on February 14th, entered an order accepting Wolf's resignation. The proceeding continued against Griffith.

██ ██ Griffith's contention is that he was prejudiced before the Trial Panel from guilt by association with Wolf. Because this is an obvious problem when two or more lawyers are charged with the same conduct we have carefully reviewed the record to determine if Griffith was prejudiced. We find that the Trial Panel was very careful not to find Griffith at fault

---

[13] The Trial Panel commented on the third part of Griffith's affirmative defense as follows:

"* * * [T]he Bar during the course of its investigation, informed the Accused of what was going on and asked him to submit any information he wanted the Bar to know. Prior to filing a formal complaint the Accused was provided with those portions of the Bar's investigative report subject to public disclosure and the Accused was given a fair opportunity to respond. The procedural rules in place to prevent the bringing of unfounded charges of misconduct set out in BR 2.5 were substantially followed by the Bar."

merely because he was involved in the same business and law firm with Wolf.

BR 5.7 provides:

> "Trial panels shall not consider evidence relating to the imposition of sanctions until after all evidence regarding the merits of the Bar's charges have been heard and a finding of misconduct has been made, except as stipulated by Bar Counsel and the accused. The issue of sanction shall, however, be considered at the same hearing, subject to the discretion of the trial panel chairperson to reconvene the panel to consider evidence in aggravation or mitigation of the misconduct found to have occurred in cases of such complexity or seriousness as to so warrant."

BR 5.7 answers Griffith's second contention. A separate hearing on the question of sanctions was within the discretion of the Trial Panel chairman.

■ Griffith's third contention that he should have been allowed a postponement to read the testimony of the crucial witnesses is answered by our previous discussion on the motion to continue the entire hearing. Griffith by his election to attend and participate in the medical malpractice case in Deschutes County in effect waived his right to appear in this matter.

All three of these contentions by Griffith come under the heading of "discretion by the Trial Panel." We find that there was no abuse of discretion.

## FIRST CAUSE OF COMPLAINT

■ The Bar alleged that Griffith undertook and continued to represent one client, First Northwest, in litigation when the exercise of independent judgment on behalf of a second client, Bear Creek Valley Bank, might be affected in violation of the following former rules:

> "DR 5-101 Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.
>
> "(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property or personal interests."

> "DR 5-104 Limiting Business Relations with a Client.
>
> "(A) A lawyer shall not enter into a business transaction

with a client if they have differing interest therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

"DR 5-105 Refusing to Accept or Continue Employment if the Interest of Another Client May Impair the Independent Professional Judgment of the Lawyer.

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B) A lawyer shall not continue employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).

"(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

"(D) Except as permitted in subsections (E) and (F), if a lawyer is required to decline employment or withdraw from employment under a Disciplinary Rule other than DR 2-110(B)(3), no affiliate of the lawyer may accept or continue such employment."[14]

---

[14] In setting out the current version of these rules we have underlined the substantive amendments for the convenience of the reader:

"DR 5-101 Conflict of Interest: Lawyer's Self Interest.

"(A) Except with the consent of the lawyer's client after full disclosure, a lawyer shall not accept employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests. *Full disclosure shall include the recommendation that the client seek independent legal advice concerning the continued representation by the lawyer.*"

"DR 5-104 Limiting Business Relations with a Client.

"(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise the lawyer's professional judgment therein for the protection of the client, unless the client has consented after full disclosure. *Full disclosure shall include recommendation that the client seek independent legal advice.*"

"DR 5-105 Conflict of Interest: Former, Current and Multiple Clients.

"(A) A lawyer shall decline proffered employment if the exercise of the

The Bar also alleged: Griffith's law firm represented the Bear Creek Valley bank located at Phoenix, Oregon at all material times. In February 1980, First Northwest loaned some people by the name of Brown $375,000 to develop some land. In December 1980, the Bear Creek Valley Bank loaned the Browns $540,000, most of which was used to pay off the previous loan from First Northwest. A dispute developed concerning the Browns' liability on the original obligation to First Northwest. The Browns filed an action in the Circuit Court to resolve the dispute. Griffith represented First Northwest in the litigation. The case was settled by the Browns conveying to First Northwest certain assets. During the dispute and litigation, Griffith knew that "the Browns were experiencing a problem with their cash flow and were having difficulty keeping their loan from Bear Creek Bank current." Griffith did not make the required disclosures to or obtain the informed consent of the Bear Creek Bank at any time while he was representing First Northwest prior to or during the Brown dispute and litigation.

Griffith's answer in effect admits the basic facts in the Bar's amended complaint as to this cause, but alleges that although he knew the Browns were having trouble with their cash flow and that his law firm generally represented Bear Creek Valley Bank, he did not know that it represented that bank in the transaction involving the Browns' loan.

In its trial memorandum the Bar claimed that Griffith had a conflict of interest in representing both First

---

lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proferred employment, except to the extent permitted under DR 5-105(C).

"(B) A lawyer shall not continue employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, except to the extent permitted under DR 5-105(C).

"(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that the lawyer can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each.

"(D) Except as permitted in subsections (E) and (F), if a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule other than DR 2-110(B)(3), no affiliate of the lawyer may accept or continue such employment."

Northwest and Bear Creek Valley Bank who had claims against a common debtor, the Browns. Griffith's trial memorandum answered by saying that he never represented the Bear Creek Valley Bank at the same time that he was representing First Northwest.

The Trial Panel found that Griffith was not guilty of the first cause of complaint. It held that there was no evidence that Griffith undertook to represent Bear Creek Valley Bank in any manner affecting his dealings with the Browns or that Griffith's independent professional judgment on behalf of Bear Creek Valley Bank was adversely affected by his representation of First Northwest.

We think that both the Trial Panel and Griffith have failed to squarely meet the point of the Bar's argument. This is demonstrated by the Bar's brief in this court:

> "Accused should not have represented First Northwest in litigation against Lester and Pat Brown, obtaining through settlement assets owned by the Browns, when Accused knew the Browns were delinquent obligors to Bear Creek Valley Bank, another law firm client. * * * Without the informed consent of the bank, Accused violated DR 5-101(A) and DR 5-105(A) and (B)."

The Bar cites no cases to support its position. There are situations in which a lawyer will have a conflict of interest when the lawyer prefers one client over another client in collecting assets from a common debtor. That is not this case. There is no showing in this record that Griffith preferred First Northwest over Bear Creek Valley Bank in collecting assets from the Browns. The only evidence is that the Browns were having trouble with their cash flow and were delinquent in their payments to Bear Creek Valley Bank. First Northwest may have had an undisputed priority position as to the assets in question. There is no evidence that the Browns were insolvent. There may have been sufficient other assets to satisfy the bank. There is nothing in the record to show that the Bear Creek Valley Bank was unduly concerned about the delinquent account. In any event, the Bar has not proved this cause of complaint by clear and convincing evidence.

## SECOND CAUSE OF COMPLAINT

In this cause the Bar alleges that Griffith violated the following parts of former rule:

"DR 1-102 Misconduct.

"(A) A lawyer shall not:

"\* \* \* \* \*

"(2) Circumvent a Disciplinary Rule through the actions of another.

"\* \* \* \* \*

"(4) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

"\* \* \* \* \*

"(6) Engage in any conduct that adversely reflects on his fitness to practice law."[15]

This cause arises from the following conduct: That at all material times Wolf was a director of Columbia Pacific Bank. Federal law required that the Board of Directors of banks give prior approval to all loans to a director or to the director's related interests when an aggregate of all loans exceeded $25,000. The federal law also required that Columbia Pacific maintain records identifying all loans and extensions of credit to directors. The state law required that loans to the related interests of a director be reported to the Board of Directors in the same manner as loans directly to the director.[16] On or

_____

[15] The current DR 1-102(A) is as follows:

"DR 1-102 Misconduct; Responsibility for Acts of Others.

"(A) It is professional misconduct for a lawyer to:

"(1) Violate these disciplinary rules, knowingly assist or induce another to do so, or do so through the acts of another;

"(2) Commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law;

"(3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

"(4) Engage in conduct that is prejudicial to the administration of justice;

"(5) State or imply an ability to influence improperly a government agency or official."

[16] In 1980 the relevant parts of ORS 708.460 provided:

"(3) Officers of the bank shall report all loans to directors, officers and employes to the board of directors at its next regular meeting after the loan is made.

"(4) A loan to a copartnership, association or corporation in which an officer,

about July 1, 1980, Wolf, who was an officer and a director of First Northwest, transferred 125 of his 150 shares in that corporation to Griffith in consideration of a promissory note in the amount of $125,000 from Griffith to Wolf. At the same time, Wolf resigned as an officer and director of First Northwest. Griffith gave Wolf a stock power which enabled Wolf to retain voting control over the 125 shares. No payment on the promissory note was ever made by Griffith. The degree of control and management exercised by Wolf over First Northwest did not change after July 1, 1980.

The Bar also alleged: The conveyance of stock from Wolf to Griffith was a sham transaction designed to conceal Wolf's actual interest in and control over First Northwest. After July 1, 1980, Griffith, Brookens, Hardy and First Northwest obtained loans and renewals from Columbia Pacific for the benefit of First Northwest without the prior approval of Columbia Pacific and without disclosing Wolf's actual interest. Griffith "knowingly engaged in or failed to exercise reasonable care to prevent Wolf, First Northwest and its shareholders from engaging" in the above described course of conduct in violation of *former* DR 1-102(A)(2), (4) and (6).

Griffith's answer to the amended complaint in effect admitted the basic facts but denied that his actions violated the Disciplinary Rules.

The Trial Panel found Griffith guilty of this cause of complaint for the following reasons:

> "The Accused, when closely questioned, testified he knew State of Oregon banking laws had been violated through his participation in the sham transaction. Several years before, the Accused and another partner of the law firm were assigned the job of reviewing and analyzing the circumstances involved with charges made by the State of Oregon Savings and Loan Supervisor that Wolf, in concert with others, willfully misrepresented by presenting false and misleading information

---

director or employe of the bank is a partner, officer of director, or in which the aggregate stock owned or controlled by any one or more than one of the officers, directors or employes of the bank is 20 percent or more of its outstanding capital shall be reported to the board of directors the same as for a loan to an officer, director or employe.

"(5) Obligations negotiated in another name for the benefit or use of any person shall be included in the obligations of the person."

and documents to the supervisor and to the board of directors of a savings and loan association an offer to purchase a controlling interest in the savings and loan association. The charge was that Wolf had attempted to conceal the true purchaser of the shares so that notice to and prior approval of the supervisor's office for the sale would not be required, a situation not greatly different than the sham transfer of First Northwest stock, the purpose of which was to avoid the necessity of Wolf reporting to Columbia Pacific's Board of Directors his related interest in First Northwest which in turn avoided the necessity of obtaining prior board of director approval for Columbia Pacific loans to First Northwest.

"The Accused testified that while he knew he had violated state law, he had no intention of being dishonest or harming anyone.

"However, after July 1, 1980 Wolf through his influence * * * obtained from Columbia Pacific many large and often questionable loans and lines of credit and renewals for First Northwest and for the Accused, Brookens, and Hardy who used the money in the mortgage business of First Northwest without obtaining prior approval of Columbia Pacific's Board of Directors. The sham transaction was used by Wolf to defeat the very purpose of the reporting and disclosure laws of the United States and the State of Oregon.

"The Trial Panel finds there is clear and convincing proof that the Accused's participation with Wolf in the sham stock transfer of First Northwest stock was willful conduct involving deceit and misrepresentation in violation of DR 1-102(A)(2) and (4), which reflects adversely on his fitness to practice law in violation of DR 1-102(A)(6)."

In this court Griffith contends that to be guilty of this cause the Bar must prove willful deceit and evil intent on his part to enter into an illegal transaction with Wolf. Griffith claims that the Bar has failed to meet its burden and that the evidence shows (1) he was a credible witness with a proper intent when he entered into the transaction, (2) he had no reason to suspect that Wolf's conduct was improper, and (3) the loans to First Northwest and its shareholders were not affected by the transaction. The crux of Griffith's argument is that he was a trial lawyer whose primary experience was in personal injury litigation and that he without any question placed his financial future in Wolf, who was a business lawyer.

The Bar argues that the issue is not whether the

transaction was illegal but whether Griffith entered into the transaction knowing that its intended purpose was to hide Wolf's actual interest in and control over First Northwest. It points out that Griffith is charged with violating former DR 1-102(A)(4) which prohibits fraud, deceit, dishonesty and misrepresentation and not former DR 1-102(A)(3) which prohibits illegal conduct.

The Trial Panel's opinion was issued on May 1, 1986, before the publication of our decision in *In re Hockett*, 303 Or 150, 734 P2d 877 (1987). We decided that case on the basis that the terms "fraud" and "deceit" set out in former DR 1-102(A)(4) refer to fraud and deceit that are actionable in Oregon in a tort sense. We need not debate whether or not Columbia Pacific could have recovered in a tort action against Griffith. We will test Griffith's conduct against the dishonesty and misrepresentation parts of former DR 1-102(A)(4).

In *In re Hockett, supra,* at 158-59, we said:

"Dishonesty is defined by Black's Law Dictionary 421 (5th ed 1979), as a '[d]isposition to lie, cheat or defraud; untrustworthiness; lack of integrity.' Trustworthiness and integrity are key concepts in the Code of Professional Responsibility as well as in Black's definition. *See, e.g.,* EC 1-1, 9-6. This is consistent with the obligation as stated by DR 1-102(A)(4)'s predecessor—Canon 22 of the former Canons of Ethics. DR 1-102(A)(4) is 'substantially equivalent to, but somewhat broader than, Canon 22 of the former Canons of Ethics which imposed upon an attorney an *obligation to be candid and fair* "before the Court with other lawyers." ' ABA Formal Opinion 337 (August 10, 1974)." (Emphasis in original.)

This court has considered former DR 1-102(A)(4) many times. In *In re Hiller*, 298 Or 526, 534, 694 P2d 540 (1985), we held that "trustworthiness is the essential principle embodied in DR 1-102(A)(4)." In *In re Brown*, 298 Or 285, 297, 692 P2d 107 (1984), we held that a lawyer who prepared and obtained a signature on a false affidavit was guilty of dishonesty. In *In re Fulop*, 297 Or 354, 361, 685 P2d 414 (1984), we said that the application of the former rule did not depend upon a lawyer-client relationship. In *In re Holman*, 297 Or 36, 57, 682 P2d 243 (1984), we held that dishonesty did not necessarily "partake of some kind of deception in the sense of misleading the victim of the conduct."

*In re Houchin,* 290 Or 433, 622 P2d 723 (1981), was a case that did not involve a lawyer-client relationship. The accused lawyer was both a teacher and a student in a community college. In order to maintain his Veteran's benefits he was required to maintain nine credit hours. To reach that level the lawyer enrolled as a student in the course which he was teaching. This was in violation of the Veterans' Administration regulations. We held that he was guilty of violating *former* DR 1-102(A)(4).

We shall not rehash the evidence in detail. We hold that the Bar has proved by clear and convincing evidence that Griffith entered into the transaction with Wolf knowing that it was designed to circumvent the State and Federal law. He knew that the transaction would allow his partner and friend to keep the ownership of the First Northwest stock and at the same time be a director of Columbia Pacific. But for the sham transaction the loans from the bank to First Northwest would have required prior approval by the bank's Board of Directors. We find that the conduct was dishonest within the meaning of *former* DR 1-102(A)(4). Griffith did not make a direct misrepresentation to Columbia Pacific, but his cooperating conduct did make it possible for Wolf to misrepresent that he no longer owned a substantial interest in First Northwest.

We find it unnecessary to reach the question of whether *former* DR 1-102(A)(4) includes an indirect misrepresentation.

■ ■ We hold that former DR 1-102(A)(2) was not intended to cover the fact situation in this cause. In the case of *In re Magar,* 296 Or 799, 818, 681 P2d 93 (1984), we held that a lawyer who violates a disciplinary rule by definition "engages in conduct that adversely reflects on his fitness to practice law" and therefore is also guilty of violating *former* DR 1-102(A)(6).

By way of summary, although we use a slightly different approach, we agree with the Trial Panel on the second cause that Griffith is guilty of violating *former* 1-102(A)(4) and *former* DR 1-102(A)(6). Griffith is not guilty of violating *former* DR 1-102(A)(2).

## THIRD THROUGH TWENTY-FIFTH
## CAUSES OF COMPLAINT

In these causes the Bar alleged that Griffith violated *former* rules DR 1-102(A)(2), (4) and (6), *supra,* and *former* rules DR 5-101(A), DR 5-104(A), DR 5-105(A), (B), (C) and (D), all *supra,* because of the following conduct:

That between 1978 and 1982, the shareholders of First Northwest, with the full knowledge and participation of Griffith, obtained 23 loans from Columbia Pacific for the benefit and use of First Northwest. (Eight of the loans were obtained by Griffith and were set out as causes of complaint 3 through 10. The balance of causes 11 through 25 were loans obtained by Brookens and Hardy.) The shareholders did not disclose to Columbia Pacific that First Northwest was the true beneficiary and the actual borrower of the loans. As a result, Columbia Pacific exceeded its loan limits in making the loans. Griffith knowingly engaged in or failed to exercise reasonable care to prevent Wolf, First Northwest and its shareholders from engaging in the conduct and therefore violated *former* DR 1-102(A)(2), (4) and (6).

The Bar further alleged: That Columbia Pacific relied upon Griffith's law firm for professional advice in regard to the above-described loans. The exercise of Griffith's professional judgment as a member of the law firm on behalf of Columbia Pacific may have been affected by Griffith's financial, business, property or personal interests. The interests of Griffith in obtaining the loans for the benefit of First Northwest differed from the interests of Columbia Pacific. The exercise of Griffith's independent professional judgment as a member of the law firm was adversely affected by the firm's representation of First Northwest. It was not obvious that the law firm could adequately represent both clients. Griffith did not make the required ethical disclosures to or obtain the informed consent of Columbia Pacific. Because of the above-described conduct, Griffith violated *former* DR 5-101(A), and *former* DR 5-105(A), (B), (C) and (D).

Griffith answered these causes by admitting that money was borrowed from Columbia Pacific, but denying the balance of the allegations.

The Trial Panel found that Griffith was not guilty of

these causes of complaint. It held that the loans were made on the dates and the amounts alleged in the amended complaint, "but that each of the borrowers considered their respective loans to be personal obligations, and not obligations of First Northwest." The bank officer who made the loans relied upon the financial position and statements of each individual borrower and knew that, in most instances, the money would be used in the First Northwest mortgage business. The Trial Panel concluded that Columbia Pacific's lending limit for First Northwest was not exceeded by the loans.

The Trial Panel also found that Columbia Pacific did not rely upon the law firm's professional judgment in regard to the loans. Griffith did not tell the bank president that there was a potential conflict of interest with respect to the loans, but the bank president testified it was obvious to him that if a legal problem had developed in regard to the loans, he would have been required to find different lawyers.

In this court the Bar argues that Griffith engaged in dishonest conduct "by participating in a funding scheme which provided First Northwest with $950,000 more of Columbia Pacific's money" than it was legally entitled to borrow. It points out that Columbia Pacific had a single borrower lending limit of $400,000 for unsecured loans and that ORS 708.305(3) provides: "Obligations negotiated in another name for the benefit of any person shall be included in the obligations of the person benefited."

The Bar claims that Griffith was serving as a mere conduit for loans from the bank to First Northwest when additional borrowing by First Northwest was prohibited by law.

From our own *de novo* review of the record we agree with the findings of the Trial Panel and the Bar's arguments fall in the face of those findings. The loans in question were made upon the personal financial statements of Griffith, Brookens, and Hardy. In the event of default the bank could look only to those individuals and not to First Northwest for payment. The bank was not misled.

In this court the Bar does not renew or press its claim that Griffith was guilty of violating *former* rules DR 5-101(A), DR 5-104(A) and DR 5-105(A), (B), (C) and (D).

We find Griffith not guilty of the 3rd through the 25th causes of complaint.

## TWENTY-SIXTH CAUSE OF COMPLAINT

In this cause the Bar alleged that Griffith violated *former* DR 1-102(A)(3):

> "(A) A lawyer shall not:
>
> "* * * * *
>
> "(3) Engage in illegal conduct involving moral turpitude."[17]

The Bar in its amended complaint alleged that Griffith (1) made or caused to be made false entries in the books and records of Columbia Pacific by concealing or causing to be concealed from the bank the true beneficiaries and actual borrowers on the credit applications and loan documents for each loan set forth in the 3rd through 25th causes of complaint, and (2) willfully misapplied or caused to be misapplied Columbia Pacific Bank funds in that he caused the bank to disburse bank funds in the names of the First Northwest shareholders set forth in the 3rd through 25th causes of complaint knowing that the true beneficiary and actual borrower was First Northwest.

Griffith's answer denied the Bar's allegations in this cause of complaint.

The Trial Panel found Griffith not guilty of this cause of complaint. It simply said that it had previously found that the loans set forth in the 3rd through 25th causes "were actual loans of the named borrower and not loans of First Northwest so that the legal lending limits for First Northwest had not been exceeded by those loans." Therefore, the Bar had failed to prove the charge by clear and convincing proof.

The Bar relies upon the 9th Circuit case of *United States v. Kennedy,* 564 F2d 1329 (9th Cir 1977), where one Herbert Adair desired to purchase an insurance company in the State of Washington. Adair contacted Eugene Kramer, a loan officer with the Bank of America, who had authority to grant loans up to $25,000 without further approval. It was

---

[17] *See* note 15, *supra,* for current version of DR 1-102(A).

agreed that Adair would secure a number of individual borrowers who would apply for loans which Kramer would approve.[18] The proceeds of the loans would then be turned over to Adair who would use them to purchase the insurance company. Kramer was to receive $15,000 for his trouble. Adair arranged with the defendant Kennedy, a practicing lawyer, to apply for a loan. Kennedy agreed to do so in return for a commitment for future legal retainers. Adair and Kennedy went to the bank where Kramer loaned Kennedy $25,000 to purchase "condominium property." Kennedy's application for the loan grossly overstated his financial condition. The purported purpose of the loan, which all three people knew was false, was entered into the bank records. Kennedy turned the proceeds of the loan over to Adair. Within a week Kennedy became a member of the Board of Directors of the insurance company which Adair was attempting to acquire. Kennedy was found guilty of (1) making false statements on the bank loan application; (2) aiding and abetting the loan officer in the misapplication of bank funds; (3) aiding and abetting the loan officer in making false entries on bank records. The 9th Circuit affirmed Kennedy's conviction stating that "the undisputed evidence shows that in truth the funds were borrowed for Adair, using Kennedy as a sham borrower." 564 F2d at 1339.

*United States v. Kennedy, supra,* is distinguishable on its facts from Griffith's conduct in connection with the loans from Columbia Pacific to the First Northwest, Brookens, Hardy and Griffith. Here the loans were to named borrowers based upon their individual financial capacity to repay. The fact that the proceeds of the loans were delivered to First Northwest to reloan to its customers does not make Columbia Pacific loans sham transactions. Griffith did not make false statements on the loan applications nor did he aid and abet a loan officer in making false bank records and in misapplying bank funds.

We find Griffith not guilty of the 26th cause of complaint.

---

[18] One of the individuals who obtained a loan under this scheme was apparently unemployed but listed his occupation as "philosopher" and his employer as "Humanity." 564 F2d at 1332.

## *TWENTY-SEVENTH CAUSE OF COMPLAINT*

 In this cause the Bar alleged that Griffith violated *former* disciplinary rules, DR 1-102(A)(3), (4) and (6), *supra.*

Specifically, the Bar alleged: (1) The state and federal law prohibited "a person, persons or an entity, directly or indirectly, or acting through or in concert with one or more other persons or entities, from owning, controlling or having the power to vote 25 percent or more of the stock of Columbia Pacific Bank without prior regulatory approval." (2) At all material times Griffith's law firm collectively through the Lawyers' Retirement Trust owned 24.98 percent of the stock of Columbia Pacific. (3) Prior to March 10, 1980, Wolf was denied prior regulatory approval for the purchase of additional stock in Columbia Pacific through the law firm's trust. (4) On March 10, 1980, at the direction of Wolf and with the knowledge of Griffith, Brookens and Hardy purchased 20,000 shares of Columbia Pacific stock which were conveyed to First Northwest, but not recorded on the books of the bank. (5) Griffith and Wolf, acting in concert, had voting power and control over the 20,000 shares of Columbia Pacific stock owned by First Northwest, but had not obtained prior regulatory approval for the purchase of the stock. (6) Griffith "knowingly engaged in or failed to exercise reasonable care to prevent Wolf and Accused from engaging in the conduct set forth in this Cause of Complaint."

Griffith's answer: (1) admitted that he was beneficiary of the Lawyer's Retirement Trust, but denied that any individual beneficiary had the right to control or vote the stock of Columbia Pacific; (2) admitted that Brookens and Hardy purchased 20,000 shares of stock in Columbia Pacific, and that they issued stock powers thereon to First Northwest, but alleged that he had no knowledge of whether or not the stock transfer was recorded with Columbia Pacific, and (3) admitted that he did not attempt to obtain regulatory approval of the stock transfer but alleged that he had no knowledge whether Wolf did or did not attempt to obtain such approval. Otherwise, Griffith admitted the basic facts but denied that their legal effect resulted in a violation of the disciplinary rules.

The Trial Panel found Griffith guilty of violating

*former* DR 1-102(A), (3), (4) and (6) in this cause of complaint. Its opinion in part said:

> "Accused would have exercised his control of First Northwest so as to vote the shares of stock owned by First Northwest as directed by Wolf.
>
> "* * * [T]here is clear and convincing evidence that the Accused knowingly failed to prevent Wolf from violating Federal and State banking regulations; that the Accused, acting in concert with Wolf, had voting power and control of more than 25% of the outstanding stock of Columbia Pacific, and that the Accused knew that the said control of stock without prior regulatory authorization violated Federal and State Banking regulations."

In this court Griffith argues that the purchase of the 20,000 shares of Columbia Pacific stock did not violate the state or federal law, but even if it did he was not aware of the violation.

The relevant portions of the Federal Deposit Insurance Act, 12 USC § 1817(j), provide:

> "(1) No person, acting directly or indirectly or through or in concert with one or more other persons, shall acquire control of any insured bank through a purchase, assignment, transfer, pledge or other disposition of voting stock of such insured bank unless the appropriate Federal banking agency has been given sixty days' prior written notice of such acquisition.
>
> "* * * * *
>
> "(8) For the purposes of this subsection, the term—
>
> "(A) 'person' means an individual or a corporation, partnership, trust, association, joint venture, pool, syndicate, sole proprietorship, unincorporated organization, or any other form of entity not specifically listed herein; and
>
> "(B) 'control' means the power, directly or indirectly, to direct the management or policies of an insured bank or to vote 25 per centum or more of any class of voting securities of an insured bank."

In *Federal Deposit Ins. Corp. v. D'Annunzio*, 524 F Supp 694 (ND W Va 1981), the court found that the defendants had violated the above quoted portions of 12 USC § 1817(j) and issued an injunction preventing them from voting the stock they had acquired. The defendants D'Annunzio and

Delaney were both directors of the Lowndes Bank in West Virginia. They purchased the stock of the largest stockholder in the West Union Bank and divided it into parts. One part was registered in the name of D'Annunzio's son, another in the name of an officer of the Lowndes Bank, and a third in the name of a company which was the nominee of the trust department of the Lowndes Bank. The court said:

> "From all the evidence it is apparent that there was no willful violation of the statute involved. If at all, a violation occurred through ignorance of the parties, counsel, financial institutions and others, of the requirements of the CBCA [Change in Bank Control Act of 1978] and the regulations promulgated pursuant thereto.

> "The absence of willfulness, however, is not crucial nor even relevant to the resolution of this case. Instead, what is important is the power to control. All of the facts here, though susceptible to different inferences in different persons' minds, would clearly indicate to this Court that if 'push came to shove' the fifty-three hundred shares of stock purchased by D'Annunzio and Delaney would have been voted intact."

524 F Supp at 699.

The last half of 12 USC § 1817(j)(8)(B) is relevant to the complaint against Griffith. The Bar contends that the statute prevented Griffith acting in concert with Wolf to acquire control of the Columbia Pacific Bank by obtaining the power to vote more than 25 percent of the stock. Although *D'Annunzio* was decided under the first half of 12 USC § 1817(j)(8)(B), it is still helpful in deciding this case.

To borrow a phrase from the *D'Annunzio* case, we conclude that if "push came to shove" there is clear and convincing evidence that the 4.89 percent of Columbia Pacific stock owned by First Northwest and the 24.98 percent owned by Lawyer's Retirement Trust would have been voted intact. We reach this result because of a combination of these facts: (1) It was well known to the beneficiaries of the Lawyer's Retirement Trust that it could not lawfully acquire more stock in Columbia Pacific; (2) In January 1980, Columbia Banshares, Inc. was incorporated for the purpose of becoming a bank holding company which would allow it to acquire more than 25 percent of the stock in Columbia Pacific. Griffith was a member of the board of directors of Columbia Banshares.

*See* note 3 *supra;* (3) The Federal Reserve Board denied Columbia Banshares' application in February, 1980; (4) In March, 1980 Griffith participated as a lawyer in the sale of the 20,000 shares of Columbia Pacific from Baxter to Brookens and Hardy who in turn transferred the stock to First Northwest; (5) The purchase of the 20,000 shares was kept secret and was not registered on the books of Columbia Pacific; (6) During the early part of 1980, Wolf was negotiating to sell Columbia Pacific to out-of-state investors at a substantial profit; (7) Wolf and Griffith had a close relationship. It was acknowledged by Griffith, Brookens and Hardy that Wolf was the dominant person in their business relationship.

The Bar alleged that Griffith "knowingly engaged in * * * the conduct set forth in this cause of complaint." Although *D'Annunzio* holds that the violation need not be "willful," we hold the Bar to its allegation and it must prove that Griffith knew the conduct was unlawful. We hold that the seven factors set out above also prove by clear and convincing evidence that Griffith knew that his conduct of acquiring in concert with Wolf over 25 percent of the voting power of the outstanding stock of Columbia Pacific without prior approval was unlawful.

We agree with the Trial Panel that Griffith is guilty of the twenty-seventh cause of complaint by violating *former* DR 1-102(A)(3), (4) and (6).

## *TWENTY-EIGHTH CAUSE OF COMPLAINT*

In this cause, the Bar alleged that Griffith violated *former* DR 1-102(A)(4), *supra,* and *former*

"DR 3-102 Dividing Legal Fees with Non-Lawyer

"(A) A lawyer or law firm shall not share legal fees with a non lawyer, except [do not apply.]"[19]

---

[19] The exceptions to *former* DR 3-102(A) are:

"(1) An agreement by a lawyer with his firm, partner, or associate may provide for the payment of money, over a reasonable period of time after his death, to his estate or to one or more specified persons.

"(2) A lawyer who undertakes to complete unfinished legal business of a deceased lawyer may pay to the estate of the deceased lawyer that proportion of the total compensation which fairly represents the services rendered by the deceased lawyer.

"(3) A lawyer or law firm may include non-lawyer employees in a retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement."

because of the following conduct: Griffith shared legal fees with the nonlawyer stockholders of First Northwest by allowing First Northwest to collect and keep legal fees that were owed to Griffith's law firm. Griffith's answer denied these allegations.

The evidence showed that on about July 1, 1980, Wolf formed a joint venture for several individuals in the Medford area under the name of Village Joint Venture. Shortly thereafter First Northwest loaned to Village Joint Venture the sum of $959,000. In October 1981, First Northwest added to the balance due it the sum of $52,385 representing legal fees, some of which went back as far as 1978, for services rendered to some of the people that made up the joint venture. In July 1982, Columbia Pacific loaned the corporations which succeeded the joint venture $1,100,000 to retire the debt owed to First Northwest. Included in the payoff to First Northwest was the above mentioned $52,385 in attorney fees. In September 1982, the Medford people who were stockholders in the new corporations complained. At that time, Griffith refunded the sum of $25,000 to the Medford group. The balance of $27,385 was kept by First Northwest. Brookens and Hardy, who were stockholders of First Northwest, were not lawyers in any jurisdiction.

The Trial Panel made the following findings:

"There is no evidence indicating or supporting the charge that the Accused engaged in any conduct involving dishonesty, fraud, deceit or misrepresentation with respect to the attorney's fees. Nor is there any evidence that the Accused even knew that First Northwest had collected the attorney's fees until after they had been collected and retained by First Northwest. However, when the Accused discovered that First Northwest had collected fees that were rightly the property of Accused's law firm, Accused failed to take action to see that the fees were paid to the law firm and thereby shared fees which were the property of the law firm with non-lawyers in violation of DR 3-102(A)."

We agree with the Trial Panel that there is no evidence supporting the charge that Griffith's conduct under this cause involved dishonesty, fraud, deceit or misrepresentation and therefore he is not guilty of violating former DR 1-102(A)(4). However, we disagree with the Trial Panel that Griffith shared attorney fees with non-lawyers. We find

Griffith not guilty of violating DR 3-102(A).

■ The prohibition of DR 3-102(A) that a "lawyer * * * shall not share legal fees with a non-lawyer" has its roots in Canon 3: "A lawyer should assist in preventing the unauthorized practice of law." We may also use the Ethical Considerations to help us determine the intent of the Disciplinary Rules. *In re Moore,* 299 Or 496, 507, 703 P2d 961 (1985).[20]

The Ethical Considerations which are relevant to the interpretation of DR 3-102(A) are:

"EC 3-1 The prohibition against the practice of law by a layman is grounded in the need of the public for integrity and competence of those who undertake to render legal services. Because of the fiduciary character of the attorney-client relationship and the inherently complex nature of our legal system, the public can be assured of the requisite responsibility and competence only if the practice of law is confined to those who are subject to the requirements and the regulations imposed upon members of the legal profession.

"EC 3-2 The sensitive variations in the considerations that bear on legal determinations often make it difficult even for a lawyer to exercise appropriate judgment. Competent professional judgment is the product of a trained familiarity with law and legal processes, a disciplined, analytical approach to legal problems, and a firm ethical commitment.

"EC 3-3 Non-lawyers who undertake to handle legal matters are not regulated as to integrity or legal competence. A lawyer is not only subject to that regulation but also is committed to high standards of ethical conduct.

"EC 3-4 A layman who seeks legal services often is not in a position to judge whether he will receive proper professional attention. The entrustment of a legal matter may well involve the confidences, the property, the

---

[20] In *In re Moore,* 299 Or 496, 507, 703 P2d 961 (1985), this court said:

"We recognize that Ethical Considerations are not a part of the Disciplinary Rules and that a lawyer cannot be disciplined for violating them. *In re Tonkon,* 292 Or 660, 664, 642 P2d 660 (1982). However, they are available to aid us in determining the intent of the rules. *In re Brown,* 298 Or 285, 191, 692 P2d 107 (1974)."

freedom, or even the life of the client. Proper protection of members of the public demands that no person be permitted to act in the confidential and demanding capacity of a lawyer unless he is subject to the regulations of the legal profession.

"* * * * *

"EC 3-8 Since a lawyer should not aid or encourage a layman to practice law, he should not practice law in association with a layman or otherwise share legal fees with a layman. * * *."

Canon 3 and the Ethical Considerations demonstrate that the prime purpose of DR 3-102(A) is to keep non-lawyers from practicing law. The underlying purpose is to protect the public from non-expert legal advice. In *Com. On Professional Ethics v. Lawler,* 342 NW2d 486 (Iowa 1984), the lawyer charged with unethical conduct had employed a former inmate of the Iowa Men's Reformatory as a legal assistant and investigator. The former inmate referred a current inmate to the lawyer to pursue post-conviction relief. The lawyer and the current inmate entered into an employment agreement. $1,500 was paid to the lawyer and $500 to the investigator as retainers. The lawyer was to receive $60 an hour and the investigator $25 an hour for their services. The Iowa Supreme Court suspended the lawyer for three years. After considering the above quoted portion of EC 3-8, the court said:

"A rationale advanced for the prohibition against sharing fees with laypersons, beyond the obvious observation that fee splitting encourages laypersons to practice law, has been stated as follows:

'[T]he underlying purpose of regulating the practice of law is not so much to protect the public from having to pay fees to unqualified legal advisors as it is to protect the public against the often drastic and far reaching consequences of their inexpert legal advice.

"*In Re Baker,* 8 N.J. 321, 339, 85 A.2d 505, 514 (1951).' "

342 NW2d at 488. *See also Matter of Weinroth,* 100 NJ 343, 349-350, 495 A2d 417 (NJ 1985).

We hold that DR 3-102(A) prohibits a lawyer from giving a non-lawyer a share of a legal fee in exchange for services related to the obtaining or performance of legal work. Here Griffith is accused of sharing the legal fee from the

Medford Group with First Northwest. The fee in question was added to the mortgage balance due from the Medford Group to First Northwest. The Bar specifically claims that because Brookens and Hardy, non-lawyers, were shareholders in First Northwest, they shared in the legal fee. First Northwest was used only as a vehicle to collect the fee. There is no evidence that First Northwest, Brookens or Hardy did anything to generate or perform the legal services. None of them was engaged in the unauthorized practice of law. It is true that First Northwest directly, and Brookens and Hardy indirectly, had the use of the money that represented the legal fees. The money was owed to Griffith's law firm. When and how the funds should have been transmitted to the law firm is a question that is not before us.

We find Griffith not guilty of the twenty-eighth cause of complaint.

### TWENTY-NINTH, THIRTIETH, THIRTY-FIRST and THIRTY-SECOND CAUSES OF COMPLAINT

The Trial Panel in its opinion considered these four causes of complaint together. It found Griffith not guilty of each of the four causes. We will not discuss the 31st cause because the Bar's limited brief in this court has not persuaded us to change the result reached by the Trial Panel.

In each of the three remaining causes the Bar alleged that Griffith violated *former* rules DR 1-102(A)(2) and (6), DR 5-101(A), DR 5-104(A) and DR 5-105(A), (B), (C) and (D), all *supra.*

The underlying property in these causes of complaint is the 16-acre subdivision in the Medford area that has been previously mentioned in this opinion.[21]

The Bar alleged that these causes of action arose out of the following facts: In January 1982, Griffith and Wolf caused Central Point Development Corporation to be incorporated. The initial shareholders were Griffith, Brookens, Wolf and the members of Village Joint Venture. Simultaneously

---

[21] The Bar has attached an appendix to its brief in this court setting out the history of this 16-acre subdivision. The history starts in 1978 and ends in 1982. It lists 15 separate transactions and names eight corporations or partnerships and 12 individuals.

with the incorporation of Central Point, members of the Village Joint Venture conveyed the 16 acres known as Village Subdivision to Central Point, with the intent that Central Point would complete the subdivision and pay off the debt owed by the members of Village Joint Venture to First Northwest. In order to capitalize Central Point, Wolf instructed some of the individual members of Village Joint Venture to borrow $250,000 from lending institutions and pay those funds into Central Point. $120,000 of that sum was borrowed from Columbia Pacific. Griffith and Wolf then caused the $250,000 to be applied to the loan balance owing to First Northwest from Village Joint Venture.

The Bar also alleged: In July 1982, members of Village Joint Venture owed First Northwest in excess of $1 million on the Village Subdivision construction loan. The loan was past due. At the same time, First Northwest, Griffith, Brookens, and Hardy owed Columbia Pacific in excess of $1.7 million on past due loans. Griffith and Wolf were guarantors on all of these loans owed to Columbia Pacific. In July 1982, Wolf formulated a plan whereby Village Joint Venture and others obtained a $1.1 million loan from Columbia Pacific which was used to pay off the loan owing by Village Joint Venture to First Northwest.

The Bar in effect divided the above facts into three causes: The incorporation of Central Point and the conveyance of the 16-acre tract as the 29th cause, the capitalization of Central Point and the payment of $250,000 from Central Point to First Northwest as the 30th cause, and the payment of the $1.1 million from Columbia Pacific through Village Joint Ventures and others to First Northwest as the 33rd cause.

*(A) Twenty-ninth Cause:* The Bar in effect leveled a shotgun blast of "conflicts of interest" charges in each of the three causes under consideration. This is demonstrated by the 29th cause. The Bar alleged:

"68.

"At all times herein, Wolf was legal counsel to Central Point, with the knowledge of Accused. As a member of the law firm with Wolf, Accused was also legal counsel for Central Point and performed legal services for Central Point.

"* * * * *

"70.

"The Village Joint Venture, its members, and Central Point relied upon the law firm for professional judgment and advice generally and in regard to the formation of Central Point and the real property conveyance in particular.

"71.

"The exercise of Accused's professional judgment as a member of the law firm on behalf of Central Point, the Village Joint Venture and its members was, or reasonably may have been expected to be affected by Accused's financial, business or personal interests.

"72.

"The interests of Accused in the formation of Central Point and in the conveyance of property from the Village Joint Venture to Central Point differed from the interests of Central Point, the Village Joint Venture and its members.

"73.

"The exercise of Accused's independent professional judgment as a member of the law firm on behalf of Central Point, the Village Joint Venture and its members was or was likely to be adversely affected by the law firm's representation of First Northwest. It was not obvious the law firm could adequately represent the interests of each of its clients.

"74.

"Accused did not make required ethical disclosures to, or obtain the informed consent of, Central Point, the Village Joint Venture and its members at any time prior to or during the formation of Central Point and the real property conveyance described herein.

"75.

"Accused knowingly engaged in or failed to exercise reasonable care to prevent Wolf and Accused from engaging in the conduct set forth in this Cause of Complaint."

It is obvious from the above allegations that:

Paragraph 71 alleges a violation of *former* DR 5-101(A).

Paragraph 72 alleges a violation of *former* DR 5-104(A).

Paragraph 73 alleges a violation of *former* DR 5-105(A) and/or (B).

Paragraph 74 alleges that Griffith did not comply with the "bail out" exception of *former* DR 5-105(C).

Paragraph 75 attempts to allege a violation of *former* DR 1-102(A)(2).

Griffith's answer to the 29th cause was a general denial.

The Trial Panel found Griffith not guilty of any of the alleged violations on the following basis: Wolf orchestrated the transactions between the parties. Griffith was not employed by any of the organizations in any of the matters described in this cause. In most instances Griffith was not aware of what advice Wolf and the other members of his law firm were giving the organizations and people involved. ORS 40.135(1)(x) provides a presumption that "the law has been obeyed" and therefore Griffith could "reasonably assume that Wolf and other members of the firm made the disclosures required * * * and obtained the required informed consent * * *."

*Former* DR 5-101(A) and *former* DR 5-104(A) concern the conflict of interest between a lawyer and his client who may have differing financial, business, property or personal interests. On the other hand, *former* DR 5-105(A) and (B) concern the conflict of interest between two or more clients.

■ The ground rules for the application of former DR 5-105(A) and (B) are set out in *In re Johnson,* 300 Or 52, 707 P2d 573 (1985). First, we determine if the conflicting interests of the clients are actual, likely or unlikely. This is dictated by the rules themselves. Each rule refers to "if the exercise of [the lawyer's] independent professional judgment in behalf of a client *will be or is likely to be* adversely affected * * *." (Emphasis supplied.)

■ The distinction between "actual" and "likely" is important because when there is an actual conflict DR 5-105(C) does not apply and a lawyer cannot avoid the obligations of DR 5-105(A) or (B) by disclosure and consent.

In the case of *In re Jans,* 295 Or 289, 295, 666 P2d 830 (1983), this court said: "It is never proper for a lawyer to represent clients with conflicting interests no matter how carefully and thoroughly the lawyer discloses the possible

effect and obtains consent." *See also In re Jordan,* 300 Or 430, 436, 712 P2d 97 (1985).

*In re Johnson, supra,* also sets out a two-step test to be used to determine the degree of culpability to which a lawyer will be held in conflict of interest cases: (1) The lawyer must have actual or imputed knowledge of the conflict. Knowledge of facts may be imputed to the lawyer if it is shown by clear and convincing evidence that by the exercise of reasonable care such facts should have been known to the lawyer. (2) Given the facts as found then the Trial Panel or this court on *de novo* review must determine whether there was a conflict of interest between the lawyer's clients. The lawyer's recognition of the conflict of interest is not a part of the test.

■ *Former* DR 5-105(A) and *former* DR 5-105(B) are designed to cover different situations. *Former* DR 5-105(A) provides that the lawyer shall refuse to accept the employment when there is a conflict of interest. *Former* DR 5-105(B) provides that the lawyer shall discontinue his employment when a conflict of interest develops. It is difficult to determine from the Bar's allegations in paragraph 73, set out above, whether it intended to allege a violation of *former* DR 5-105(A) or *former* DR 5-105(B). If this were a civil case the paragraph would have been vulnerable to a motion to make more definite and certain. We hold that a violation of *former* DR 5-105(A) was pleaded in the 29th cause. We will not consider *former* DR 5-105(B) further in this cause.

■ The next question is to determine if there was an actual, likely or unlikely conflict of interest between Central Point, Village Joint Venture, and First Northwest when Central Point was formed and the 16-acre tract was conveyed to it by Village Joint Venture. There is no doubt that Griffith's law firm represented all three principals. At the time in question, Village Joint Venture was delinquent on substantial loans that it had received from First Northwest. Central Point received property which had been mortgaged to First Northwest by Village Joint Venture. The position of Central Point and Village Joint Venture was adverse to that of First Northwest. An actual conflict of interest exists when a lawyer undertakes to represent both sides in a real estate transaction. *In re Baer,* 298 Or 29, 34, 688 P2d 1324 (1984). *See In re Jans,*

*supra; In re Hershberger,* 288 Or 559, 606 P2d 623 (1980). In the later case of *In re Bristow,* 301 Or 194, 203, 721 P2d 437 (1986), this court said that an actual conflict exists when a lawyer places himself "in a position where the exercise of his independent professional judgment on behalf of one client would be adversely affected by the differing interests of the other client," quoting *In re Porter,* 283 Or 517, 524, 584 P2d 744 (1978).

Griffith had actual knowledge of the conflict between the parties. Not only was he one of the lawyers for Central Point and First Northwest, he was also a shareholder and officer of both corporations.

By clear and convincing evidence we find Griffith guilty of violating *former* DR 5-105(A) of the 29th cause. *Former* DR 5-105(C) does not apply and is unavailable to Griffith. The Bar should not charge a violation of that rule. *In re Jordan, supra,* at 436.

Next we consider whether Griffith violated *former* DR 5-101(A) or *former* DR 5-104(A) in the 29th cause. In the above-described paragraph 71 the Bar in effect alleged that Griffith violated *former* DR 5-101(A) because he accepted employment by Central Point and Village Joint Venture when the exercise of his professional judgment on behalf of them was or reasonably may have been affected by his financial or property interest in First Northwest. Paragraph 74 alleges that Griffith did not obtain the consent of Central Point and Village Joint Venture after a full disclosure.

In the above-described paragraph 72 the Bar in effect alleged that Griffith violated former DR 5-104(A) by entering into a business transaction with Central Point and Village Joint Venture by the formation of Central Point and the conveyance to it of the 16-acre tract when his interests differed from those of Central Point and Village Joint Venture. Paragraph 74 alleged that Griffith did not obtain the consent of Central Point and Village Joint Venture.

At the time in question Village Joint Venture was in default on a substantial loan that it had obtained from First Northwest to develop the 16-acre subdivision. At this same time Griffith not only held his original one-fourth interest in First Northwest but had participated in a sham transaction to

"buy" most of Wolf's stock in the same corporation. (See second cause). Griffith testified that before the transactions in question, he made a trip to Medford with Wolf to meet the. members of Village Joint Venture. The purpose of the trip was "to meet them and kind of to get a sense of whether First Northwest should be suing, foreclosing, working with them or what." It is obvious that the formation of Central Point and the conveyance of the 16 acres was designed to protect the interest of First Northwest. In the original incorporation Wolf, Brookens, and Griffith held 51 percent of the stock in Central Point while the Medford people held 49 percent. Griffith's first loyalty was to First Northwest.

It could be argued that First Northwest and not Griffith entered into a business transaction with Central Point and the members of Village Joint Venture. It could be further argued that Griffith was not the alter ego of First Northwest. In any event, Griffith did enter into a business transaction with the individual members of Village Joint Venture when they joined forces to form Central Point. The Bar complaint is broad enough to include the latter situation.

Griffith's actions violated both *former* DR 5-101(A) and *former* DR 5-104(A) unless the members of Village Joint Venture "consented after full disclosures."[22]

We do not agree with the Trial Panel that Griffith had a right to "reasonably assume that Wolf and other members of the firm made the disclosures required by the Disciplinary Rules and obtained the required informed consent of the parties represented by the firm." The Trial Panel's conclusion brings into sharp focus one of Griffith's major contentions in this case: That he was an "intersection" or personal injury trial lawyer and that he placed complete trust in Wolf who was expert in the field of business and finance law and therefore he paid very little attention to the affairs of First Northwest. The record shows that Wolf was the quarterback who called the signals. It also shows that Griffith was not a third-string tackle who sat on the far end of the bench. He made at least two trips to meet with members of Village Joint

---

[22] The Trial Panel also said: "Wolf's manner of presenting and explaining written documents was such that the parties never read the documents, but rather relied on Wolf's explanations and representations as to the content and legal effect of the documents."

Venture. Griffith was an incorporator, shareholder, director and an officer of Central Point. The Articles of Incorporation were forwarded to the State of Oregon over his signature. Later Griffith was responsible for firing a $3,000-per-month employe of Central Point to save money and thereafter met periodically with the company's accountant to discuss the Medford project. Griffith's role was more like a first-string blocking back who played most of the time and who along with the quarterback was responsible for the win or loss.

We find by clear and convincing evidence that in the 29th cause, Griffith is guilty of violating *former* DR 5-101(A) and *former* DR 5-104(A).

The Bar also alleged in the 29th cause that Griffith violated *former* rules DR 1-102(A)(2) and (6). As previously set out in this opinion, *former* DR 1-102(A)(2) provides that a lawyer shall not circumvent a disciplinary rule through the actions of another. This rule does not fit the situation alleged in this cause of complaint and Griffith did not violate it.

*Former* DR 1-102(A)(6) provides that a lawyer shall not engage in conduct that adversely reflects on his fitness to practice law. In the second cause in this case, we pointed out that *In re Magar,* 296 Or 799, 818, 681 P2d 93 (1984), holds that a lawyer who violates a disciplinary rule, by definition also violates *former* DR 1-102(A)(6). In the 29th cause we have held that Griffith has violated *former* rules DR 5-101(A), DR 5-104(A) and DR 5-105(A). Therefore he has also violated *former* DR 1-102(A)(6).

*(B) Thirtieth and Thirty-third Causes:* These causes of complaint are the second and third verses of the same song that gave rise to the 29th cause. The Bar carved these causes of complaint out of the series of events that made up the recovery by Wolf, Griffith and Brookens on the bad loan that First Northwest had made to the members of Village Joint Venture on the 16-acre subdivision. The 30th cause involves the capitalization of Central Point by the borrowing of $250,000 by some of the members of Village Joint Venture and the payment of those funds to First Northwest. The 33rd cause involves borrowing $1.1 million from Columbia Pacific by Central Point and others and the payment of the funds to First Northwest. The allegations in the 30th and 33rd causes are the same as those in the 29th cause—only the names have

been shuffled and the dates and amounts changed. The alleged violations of the disciplinary rules are the same.

There is no point in our rehashing what is obvious. We hold by clear and convincing evidence that Griffith is guilty in the 30th and 33rd causes of violating the same former disciplinary rules that he violated in the 29th cause with one exception. He did not violate *former* DR 5-104(A). He did not personally enter into further business relationships with a client. First Northwest entered into further business relationships with others who were Griffith's law firm's clients. The Bar has not argued that First Northwest was Griffith's alter ego—it is a separate entity.

## THIRTY-SECOND CAUSE OF COMPLAINT

■■ ■■ In this cause the Bar alleged that Griffith violated former Disciplinary Rules DR 1-102(A)(2), (4) and (6), all *supra,* and the following statutes:

"[ORS 9.460] An attorney shall:

"* * * * *

"(4) Employ, for the purpose of maintaining the causes confided to the attorney, such means only as are consistent with truth, and never seek to mislead the court or jury by any artifice or false statement of law or fact;

"[ORS 9.527] The Supreme Court may disbar, suspend or reprimand a member of the bar whenever, upon proper proceedings for that purpose, it appears to the court that:

"* * * * *

"(4) The member is guilty of wilful deceit or misconduct in the legal profession."

This cause also arises out of the transactions concerning the 16-acre subdivision near Medford. The Bar alleged: In July 1982, a loan in excess of $1 million owed by the members of the Village Joint Venture to First Northwest on the subdivision was past due. At the same time a loan in excess of $1.7 million owed by First Northwest, Griffith, Brookens and Hardy to Columbia Pacific was also past due.[23] Wolf, on behalf of First Northwest, formulated a plan whereby members of Village Joint Venture, Central Point and others would

---

[23] Because of the cross guarantees between the shareholders of First Northwest, Wolf had in effect guaranteed these loans.

borrow $1.1 million from Columbia Pacific to pay off the loan owing from Village Joint Venture to First Northwest. To carry out this plan, Wolf (a) incorporated Rogue Valley Development Group with some of the members of Village Joint Venture and some new Medford people as principals; (b) formed Kingsland Manor, a partnership among some of the members of Village Joint Venture; (c) restructured Central Point by eliminating Griffith, Wolf and Brookens as shareholders; (d) instructed the president of Columbia Pacific to divide the $1.1 million loan from that bank between Rogue Valley, Kingsland Manor and Central Point; (e) directed Columbia Pacific to disburse the proceeds of the $1.1 million loan to the accounts of First Northwest, Griffith, Brookens and Hardy at Columbia Pacific.

The Bar also alleged: Wolf directed that the $1.1 million loan be divided between Rogue Valley, Central Point and Kingsland Manor so as to circumvent the legal lending limits of Columbia Pacific. Wolf concealed from Columbia Pacific's Board of Directors the true borrowers and beneficiaries of the $1.1 million loan. Wolf represented all parties to these transactions. At the time the $1.1 million loan was disbursed, Griffith knew: (a) Wolf had arranged for Columbia Pacific to loan $1.1 million to members of Village Joint Venture and shareholders of Central Point; (b) a substantial portion of the funds from the loan were to be paid to First Northwest; (c) First Northwest, in turn, used the loan proceeds to reduce the overdue loan obligations of First Northwest and its shareholders at Columbia Pacific; (d) Columbia Pacific Bank renewed certain loan obligations that First Northwest and its shareholders had at the bank; (e) First Northwest and Columbia Pacific were in financial difficulty and Village Joint Venture and Central Point could not service or repay the $1.1 million loan obligation.

Griffith's answer was a general denial.

*Former* DR 1-102(A)(4) provides that a lawyer shall not "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." We have previously discussed this Disciplinary Rule in detail in the second cause of complaint. We will not repeat that discussion. We hold that Griffith, although at times semi-passive, was a willing participant in a dishonest scheme that in effect transferred a bad loan in the

amount of $1.1 million from First Northwest to Columbia Pacific. His loyalty to First Northwest was greater than his loyalty to Columbia Pacific. We hold that by clear and convincing evidence Griffith is guilty of violating *former* DR 1-102(A)(4). Griffith is also guilty of violating *former* DR 1-102(A)(6). *In re Magar, supra. Former* DR 1-102(A)(2) does not apply.

We hold also that Griffith is guilty of willful misconduct in violation of ORS 9.527(4). *In re Willer,* 303 Or 241, 246, 735 P2d 594 (1987); *In re Bridges,* 298 Or 53, 61, 688 P2d 1335 (1984); *In re Morrow,* 297 Or 808, 818, 688 P2d 820 (1984). ORS 9.460(4) does not apply.

### THIRTY-FOURTH CAUSE OF COMPLAINT

■■ ■■ In this cause of complaint the Bar alleged that Griffith violated former Disciplinary Rules:

"DR 1-102 Misconduct.

"A) A lawyer shall not:

"* * * * *

"(3) Engage in illegal conduct involving moral turpitude.

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

because of the following conduct: At all material times ORS 165.100 and 18 USC § 1014 prohibited a person from knowingly making or issuing a false financial statement for the purpose of influencing the action of a bank upon a loan application renewal.[24]

---

[24] ORS 165.100 provides:

"(1) A person commits the crime of issuing a false financial statement if, with intent to defraud, the person:

"(a) Knowingly makes or utters a written statement which purports to describe the financial condition or ability to pay of the person or some other person and which is inaccurate in some material respect; or

"(b) Represents in writing that a written statement purporting to describe a person's financial condition or ability to pay as of a prior date is accurate with respect to that person's current financial condition or ability to pay, knowing the statement to be inaccurate in that respect.

"(2) Issuing a false financial statement is a Class A misdemeanor."

18 USC § 1014 provides:

"Whoever knowingly makes any false statement or report or willfully over-

The Bar further alleged that between June 1980 and March 1983, through a series of written financial statements Griffith knowingly misrepresented his own financial worth, liquidity and ability to repay Columbia Pacific, Canadian Imperial Bank of Commerce and Peoples National Bank of Washington for the purpose of obtaining extensions of credit for himself.

Griffith's answer was in effect a general denial.

The Trial Panel found that Griffith had violated both former DR 1-102(A)(3) and (4). It said that Griffith knowingly misrepresented the value of assets reported on his financial statements and failed to disclose in some of the statements substantial contingent liabilities. It held that the conduct violated state and federal banking laws and was conduct involving moral turpitude.

Griffith points out in his brief in this court that to prove a violation of ORS 165.100, *supra,* the Bar must show by clear and convincing evidence (1) a written financial statement, (2) knowingly submitted to one of the three banks named in the complaint, (3) containing a material inaccuracy, (4) submitted with intent to defraud.

Griffith also points out that to prove a violation of 18 USC § 1014, *supra,* the Bar must prove by clear and convincing evidence (1) a false statement to one of the three banks named in the complaint, (2) for the purpose of influencing actions of the bank, (3) that the statement was false as to a material fact, and (4) Griffith knew it was false.

The Bar in its brief counters by stating that Griffith is charged with both illegal conduct (*former* DR 1-102(A)(3)) and dishonest conduct (*former* DR 1-102(A)(4)) and therefore he could be found guilty of violating the latter disciplinary rule "even if all the elements of a criminal offense are not present."

This cause involves three separate financial statements. Under our *de novo* review we have examined all of

values any land, property or security for the purpose of influencing in any way the action of * * * [a bank] upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment or loan, or any change or extension of any of the same, by acceptance, release or substitution of security, therefore, shall be fined not more than $5,000 or imprisoned nor more than two years, or both."

them in detail, but we elect to discuss only the statement of November 25, 1981. It was made during a time period when First Northwest needed additional cash. To help the situation Brookens and Griffith were contemplating purchasing additional shares in the corporation. Lester Hardy wanted out of First Northwest but was told that the financial position of the corporation would not permit it. The Village Joint Venture project in Medford and another project in Springfield were in financial trouble.[25]

The Bar's chief complaint about this financial statement is the entry under assets which reads:

"First Northwest Financial Corp.—
"ratio of 2.5 × book value $1,216,528.00"

Under liabilities is an entry which shows Griffith owing Thomas E. Wolf the sum of $125,000. The financial statement does not say so but we conclude from the record that the entry in question represents the original 150 shares which Griffith purchased for $26,250, plus the 125 Wolf shares which we discussed in the second cause.

An independent audit by Peat, Marwick, Mitchell & Co. as of June 30, 1981, shows 600 shares of First Northwest issued and outstanding for a total value of $434,013 for stockholders equity, including a capital account of $105,000. Therefore the book value of the stock was $723.35 per share. The total book value of Griffith's 275 shares was $198,921.25. 2.5 times book value of 275 shares equals $497,303.12.

Between June 30, 1981, and October 31, 1981, the financial condition of First Northwest did not improve. Disaster struck. An internal audit prepared by the corporation on the latter date showed the capital account remained at $105,000 but a loss in earnings had reduced the total stockholders' equity to a minus $146,673.35. Another internal audit as of November 30, 1981 showed the capital account constant but the stockholders' equity had been further reduced to a minus $178,322.04.

We can draw only one inference—on November 25,

---

[25] This financial statement was prepared about six weeks prior to Griffith's trip to Medford with Wolf to determine if First Northwest should foreclose against Village Joint Venture. See this opinion's discussion under the 29th cause, *supra.*

1981, the stock in First Northwest had no value. It was worthless. Griffith's statement that his stock was worth $1,216,528 was a gross and flagrant misrepresentation.

On the financial statement in question Griffith showed his "NET WORTH BEFORE TAXES" to be $1,949,054. If the $1,216,528 listed as the value of First Northwest stock is subtracted Griffith's net worth is reduced to $732,526.

The Bar also points out that the statement does not show as a liability the $250,000 that Griffith owed to Columbia Pacific on his line of credit. Griffith borrowed the money for the use of First Northwest, and therefore he claims that if the liability is shown, he should be entitled to an offsetting credit that the same amount is due him. Normally Griffith would be correct but considering the financial condition of First Northwest on November 25, 1981, it is doubtful that the amount was collectable on that date.[26]

The statement in question also lists as an asset a 13.12 percent interest in Lawyers' Retirement Trust for $259,139. The trust owned a total of 93,700 shares of Columbia Pacific stock. Griffith's beneficial interest of 13.12 percent represented 12,293.44 shares. $259,139 divided by 12,293 shares equals $21.08 per share. The 1981 annual statement of Columbia Pacific states that Foster & Marshall Inc., a stock brokerage house, quoted a price on the stock of 8 3/4 bid and 9 3/4 asked for the fourth quarter of that year.[27]

The Bar also contends that Griffith should have listed an offsetting liability to Wells Fargo Bank when he listed the value of Lawyers' Retirement Trust. Griffith answers by saying that the debt to Wells Fargo was owed by Wolf as trustee and that he had only a contingent liability

---

[26] The line of credit from Columbia Pacific was in fact paid in July 1982 when Wolf persuaded Columbia Pacific to loan Rogue Valley, Central Point and Kingsland Manor $1.1 million which was used to pay the debt owed by Village Joint Venture to First Northwest. Griffith used his share first to pay off and then renew his line of credit with Columbia Pacific. *See* 32nd Cause, *supra.*

[27] We recognize that the price of the stock of Columbia Pacific was probably not constant for the entire 4th quarter of 1981. Therefore the prices quoted in the annual report must have been the average prices for that quarter.

because of his personal guarantee. In spite of Griffith's argument, the value of the assets of the trust were reduced by the amount of the note.[28]

Griffith testified he reached the $1,216,000 value of the First Northwest stock in his November 25, 1981 financial statement as follows:

"(Q) (SCHULTE) So you are saying that this figure of 1,216,000 is what you felt the two and a half times of your market value of your interest in the company was worth at that time? Is that what you're trying to say?

"(A) (GRIFFITH) What I'm saying is this is the number that's probably given to me by Tom Wolf which I believed to be accurate. I have no reason to think he would give me an inaccurate figure. And I had no reason not to believe that he had a great deal more knowledge than I about those kinds of computations and what you'd put in something like this."

Later Griffith explained further:

"(A) What this number means is that Tom Wolf would have given me, and it was on the reliance of what do I put down for this asset, and this is what he would advise me. So, I probably would have never thought about it other than to think of it being as whatever Wolf happened to tell me. That would have been the source of my knowledge, both of the number and of book value.

"* * * * *

"BY Mr. SCHULTE

"(Q.) Did you even inquire about the definition of book value? That's where I'm having a lot of trouble because, at this time, you only had invested roughly $75,000 in the company.

"(A.) No, I did not make that inquiry. I would get the whole thing, you see. In other words, I'd say, 'What do I put down?' He'd say, 'Two times book,' this number, and that's what I'd put down. If he said nothing about book value and a number, that's what I'd put down.

"(Q.) Mr. Griffith, you must have been literally dancing

---

[28] We cannot determine the amount of liability to Wells Fargo as of November 25, 1981. On October 20, 1979, Wolf as trustee for the Lawyers' Retirement Trust signed a note to Wells Fargo in the amount of $937,000. By August 5, 1983, the balance had been reduced to approximately $600,000.

to think that your $75,000 investment was now worth a million-two at this point in time. I mean, did you believe you were worth that much money?

"(A.) Yes.

"(Q.) Almost a double millionaire?

"(A.) Yes.

"(Q.) You had a sincere belief you were worth that much when you gave this statement to the bank?

"(A.) Yes.

"(Q.) You did not create this statement to justify your line of credit?

"(A.) No.

"(Q.) Your line of credit at that time was $250,000.

"(A.) Okay.

"(Q.) Were you present at any meetings of the shareholders of First Northwest at around this time where there was discussion about your inability to meet the obligations of First Northwest?

"(A.) There was a need for cash, and there was a meeting where not only cash was being contributed but Hardy wished to disentangle from First Northwest or reduce his interest in it."[29]

The financial statements in question were delivered to the banks named in the Bar's complaint and those banks relied upon the information therein contained to loan money to Griffith.

We have discussed only one of Griffith's financial statements. The other two statements referred to in the Bar's brief in this court contain errors which inflate Griffith's net financial worth, but are not the flagrant, gross misrepresentations set out in the November 25, 1981 statement.

---

[29] Mr. Schulte, as attorney for the Bar, was incorrect in stating that Griffith had "roughly $75,000" invested in First Northwest. Peat, Marwick, Mitchell & Co.'s audit of June 30, 1981, showed 600 shares of issued and outstanding stock for a value of $105,000. Griffith owned one-fourth of the shares at a cost of $26,250. The internal audits of First Northwest as of October 31 and November 30, 1981, both showed the capital constant at $105,000. Some time after November 1981, Brookens and Griffith each purchased an additional $50,000 of stock in First Northwest. This comment does not take into consideration that Griffith "purchased" 125 shares of First Northwest from Wolf in July 1980.

Griffith's financial statement of November 25, 1981 does not disclose any contingent liabilities while his statement of August 5, 1983 lists contingent liabilities of $9,248,982. Griffith admitted that he had at least one contingent liability on November 25, 1981—to Wells Fargo (*see* note 28, *supra*). The Trial Panel found his failure to list the contingent liabilities to be a part of the overall violation of the Disciplinary Rules prohibiting dishonesty and misrepresentation. On this narrow issue we find in favor of Griffith. The format of the financial statement does not purport to show whether the maker had contingent liabilities. If the bank receiving the statement desired that information, it could have made further inquiry.

We agree with the following statement by the Trial Panel:

> "The Accused states that much of the information reported on his financial statements was generated by Wolf or other people who had greater knowledge of the condition of the various business enterprises in which he was an investor or better knowledge of the appropriate manner in which to value assets than he. The Accused's statement is true, however, the Accused's own personal knowledge was such that he knew the values provided to him by other people were not accurate and the Accused is responsible for the accuracy of the financial statements prepared for him and submitted by him."

We find by clear and convincing evidence that Griffith's conduct in connection with his financial statement of November 25, 1981 violated *former* DR 1-102(A)(3) and (4).

### THIRTY-FIFTH CAUSE OF COMPLAINT

In this cause of complaint the Bar alleged that Griffith violated *former* DR 1-102(A)(4), *supra,* because of the following conduct:

On March 18, 1983, Columbia Pacific was declared insolvent and closed by the Oregon Superintendent of Banks. The following day, March 19th, Griffith and his wife entered into a property settlement dividing their marital assets between them. On March 24, 1983, Griffith and his wife filed a petition and obtained a decree dissolving their marriage. Later Griffith and his wife resumed living together in the family residence. On July 20, 1983, the decree was modified by stipulation to award the residence to the wife. The dissolution was entered into by Griffith to defraud his creditors.

Griffith's answer admitted the dates and events but denied that he intended to defraud his creditors.

The Trial Panel found that Griffith was not guilty of this cause of complaint. We agree with the following portion of its opinion:

"Evidence with respect to this cause of complaint showed the Accused and his wife did not enjoy a happy marriage, that they had, at times prior to March of 1983 lived separately and had considered obtaining divorce on several occasions and that a property settlement agreement for distribution of their marital assets had been prepared a year or two before but never implemented.

"The Accused's wife recopied the prior property settlement agreement and had the Accused sign it. She prepared the divorce documents and had the divorce decree entered. The Accused simply went along with what his wife wanted including a later modification of the property settlement agreement. There was no evidence presented that the share of marital assets given to the wife by the property settlement agreement was grossly excessive nor have creditors of the Accused claimed the property settlement agreement was a fraud on creditors or attempted to have the property settlement set aside."

We find Griffith not guilty of this cause of complaint.

### THIRTY-SIXTH CAUSE OF COMPLAINT

In this cause the Bar alleged that Griffith violated former disciplinary rules DR 1-102(A)(2) and (6) and DR 5-104(A), all *supra,* because of the following conduct: The formation and incorporation of First Northwest was a business transaction between Griffith, Wolf, Brookens and Hardy. Between 1978 and 1983 First Northwest, Brookens and Hardy engaged in substantial business operations at the direction of Griffith and Wolf who were legal counsel for the corporation. Brookens and Hardy relied on Griffith and Wolf for professional advice regarding First Northwest's business operations and affairs. Griffith's interests differed from those of Brookens and Hardy regarding First Northwest business operations and affairs. Griffith did not make the required ethical disclosures to or obtain the informed consent of Brookens and Hardy prior to engaging in business with them.

Griffith's answer to this cause was a general denial.

The Trial Panel found Griffith not guilty of this cause. It used a two-part analysis. (1) At the time First Northwest was formed, Griffith, Wolf, Brookens and Hardy had the same interests in the transaction that the company undertook. Brookens and Hardy, the non-lawyer shareholders, were relatively sophisticated businessmen and based upon *In re Samuels and Weiner,* 296 Or 224, 674 P2d 1166 (1983), Griffith did not violate *former* DR 5-104(A). (2) Beginning in the Fall of 1982, the interests of the shareholders became adverse and Griffith should not have continued to represent First Northwest without the express consent of Brookens and Hardy. Therefore it is possible that Griffith did violate *former* DR 5-105(B), *supra,* but the Bar did charge a violation of that rule.

In this alleged conflicts of interest situation it is important to recognize the distinction between *former* DR 5-104(A) and *former* DR 5-105(B). The former concerns the conflict of interest between a lawyer and his client who may have differing financial, business property or personal interests. The latter concerns the conflict of interest between two or more clients. *See* discussion in the 29th cause, *supra.*

We hold that the Bar alleged there was a conflict of interest between Griffith as a shareholder and Brookens and Hardy as shareholders. It did not allege there was a conflict between two clients—that is, between First Northwest on one hand and Brookens and Hardy on the other.

We agree with the Trial Panel that at first the shareholders all had the same interest in the transactions that First Northwest undertook but that by the Fall of 1982, the interests of the shareholders had become adverse and therefore Griffith should not have continued to represent First Northwest without the written consent of Brookens and Hardy.

In the case of *In re Moore,* 299 Or 496, 507, 703 P2d 961 (1985), we considered a similar problem in regard to *former* DR 5-101(A), *supra:*

> "Moore argues that the allegations in the Bar's charges contained in the fourth and fifth causes of complaint read in terms of accepting and *'continuing employment'* while DR 5-101(A) speaks only to the acceptance of employment. (Emphasis in Moore's brief in this court.)

"Moore correctly refers to the wording of the rule. However, under Canon Five (A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client) the Ethical Considerations in part provide:

" 'EC 5-2 * * * After accepting employment, a lawyer carefully should refrain from acquiring a property right or assuming a position that would tend to make his judgment less protective of the interests of his client.

" 'EC 5-3 * * * After accepting employment, a lawyer should not acquire property rights that would adversely affect his professional judgment in the representation of his client. * * *.'

"We recognize that Ethical Considerations are not a part of the Disciplinary Rules and that a lawyer cannot be disciplined for violating them. *In re Tonkon,* 292 Or 660, 664, 642 P2d 660 (1982). However, they are available to aid us in determining the intent of the rules. *In re Brown,* 298 Or 285, 291, 692 P2d 107 (1984). We hold that DR 5-101(A) includes continued as well as initial acceptance of employment if the exercise of the lawyer's professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests."

We hold that by clear and convincing evidence Griffith violated *former* DR 5-104(A). Under the *In re Magar, supra,* rule Griffith also violated *former* DR 1-102(A)(6). Former DR 1-102(A)(2) does not apply.

### *THIRTY-SEVENTH CAUSE OF COMPLAINT*

In this cause the Bar alleged that Griffith violated *former* DR 1-102(A)(2) and (6) and *former* DR 5-104(A), all *supra,* because of the following conduct: In September 1981, Griffith and Wolf formed a partnership known as Trans West Transport Group for the purpose of purchasing and chartering the use of an aircraft to others. Griffith and Wolf were general partners. Brookens and First Northwest were each 10 percent limited partners. Griffith and Wolf were the legal counsel to Trans West and Brookens relied upon them for legal advice. The interests of Griffith differed from the interests of Brookens in the formation of the partnership and Griffith did not make the required ethical disclosures to or obtain the informed consent of Brookens.

Griffith's answer was a general denial.

The Trial Panel found Griffith not guilty of this cause for the following reasons:

"At the time the partnership was formed the interest of the various partners did not differ, they had had an ongoing business relationship of approximately three years in length, there had been no conflict between the partners and their other business dealings and there did not appear to be any conflicting interests in the formation of the partnership."

We consider this a closer question than did the Trial Panel because Brookens was a limited partner and Griffith was a general partner. However, giving Griffith the benefit of our doubt, we agree with the Trial Panel and find him not guilty of this cause.

### THIRTY-EIGHTH and THIRTY-NINTH CAUSES OF COMPLAINT

The Trial Panel considered these two causes together. We shall do likewise.

In both causes the Bar alleged that Griffith violated *former* rules DR 1-102(A)(2) and (6) and DR 5-104(A), all *supra.*

In the 38th cause the Bar also alleged: In September, 1981, Trans West purchased an airplane from Flightcraft for $2 million and financed $1.4 million of the purchase price through the seller. In February 1983, Trans West was in default on the airplane loan. Griffith and Wolf instructed Brookens to convey to Trans West real property which was then utilized as additional security to refinance the airplane loan.

In the 39th cause the Bar also alleged: In April 1983, Trans West was again in default on the airplane loan and the plane was repossessed by Flightcraft. In settlement of the amount due the partners of Trans West signed an agreement providing for periodic payments to be made by Wolf and Griffith on the deficiency. Flightcraft retained the security interest in the real property previously conveyed to Trans West by Brookens.

In both causes the Bar pleaded similar allegations to the effect: Griffith and Wolf were legal counsel to Trans West and Brookens relied upon them for professional judgment and

advice. The interests of Griffith differed from the interests of Brookens. Griffith did not make the required ethical disclosures to or obtain the informed consent of Brookens prior to the refinancing or settlement agreement.

Griffith's answer to both causes was in the nature of a general denial.[30]

The issue in both these causes is whether the interests of Griffith and Brookens were different and whether Brookens expected professional judgment and advice from Griffith.

The Trial Panel found Griffith not guilty on both causes. Its analysis was similar to that which it used in the 36th cause. It said in part:

"Neither the Accused nor Wolf advised Brookens that they had conflicting interests in the refinancing and Brookens did not obtain independent counsel to represent him in this matter. The interests of the Accused differed from the interest of Brookens regarding the refinancing of the airplane loan to Flight Craft.

"* * * * *

"Although the interest of the partners in settling the debt and avoiding the potential remedies of the lender on default were the same, the interests of each partner in the terms of the settlement conflicted.

"* * * * *

"Brookens as a result of the refinancing was relieved of substantial personal contingent liability, however, he did pledge the Woodland property which did have substantial value and in the end he did have to pay approximately $100,000 to Flightcraft to prevent foreclosure by Flightcraft on the Woodland property.

"* * * * *

"In this case, the lawyer was already part of the business transaction with the client. At the time the formation of Trans West was undertaken the interests of the lawyer and

---

[30] Sometimes for convenience in this opinion we have referred to Griffith's answer as a "general denial" or "in the nature of a general denial." BR 4.3(d) provides in part:

"The accused's answer shall be responsive to the formal complaint filed. General denials shall not be allowed. The answer shall be substantially in the form set forth in BR 12.3 * * *."

client were not different. However, with passage of time, and specifically at the time of the refinancing of the transaction, the interests of the various partners did differ. The Accused had a responsibility under DR 5-105 to advise Brookens to obtain independent counsel and to withdraw from representing him in the refinancing. However, that charge has not been made by the Bar in this cause of action."[31]

Our conclusion is much the same as that which we reached in the 36th cause. This is a *former* DR 5-104(A) case and not a *former* DR 5-105(B) case. *See In re Moore, supra.*

If there ever was a situation in which a person needed an independent lawyer it was Brookens in February to April, 1983. The flagship "Columbia Pacific" had sunk. The schooner "First Northwest" had been scuttled. Griffith, Wolf, and Brookens were floating around on an army surplus life raft that was leaking.

We find by clear and convincing evidence that Griffith violated *former* DR 5-104(A). Griffith also violated *former* DR 1-102(A)(6). *In re Magar, supra. Former* DR 1-102(A)(2) does not apply.

*SUMMARY OF CAUSES OF COMPLAINT*

We have held by clear and convincing evidence that Griffith violated at least one disciplinary rule in the following causes of complaint: 2nd, 27th, 29th, 30th, 32nd, 33rd, 34th, 36th, 38th and 39th.

*SANCTION*

In recent disciplinary cases we have considered the aggravation and mitigation factors set out in the 1986 American Bar Association standards. *See In re Howard,* 304 Or 193, 213, 743 P2d 719 (1987).

Section 9.21 of those standards contains this definition:

---

[31] Brookens' "substantial personal contingent liability" resulted from the fact that all the individual partners guaranteed the original loan from Flightcraft when the airplane was purchased. Brookens' signature on the guarantee appeared as "C. Dale Brookens by Thomas E. Wolf, attorney in fact." Wolf was not authorized to sign the guarantee for Brookens who did not learn about it until later. Brookens was a limited 10 percent partner.

Brookens estimated the Woodland property that he pledged was worth $500,000.

"Aggravation or aggravating circumstances are any considerations, or factors that may justify an increase in the degree of discipline to be imposed."

Section 9.22 then lists 10 "Factors which may be considered in aggravation." We will consider them in order.

(a) *Prior disciplinary offenses.* In this case, none.

(b) *Dishonest or selfish motive.* We have found Griffith guilty on 10 of the 39 causes of complaint causes. In four out of the 10 causes we found Griffith guilty of violating *former* DR 1-102(A)(4) which provides that a lawyer "shall not engage in conduct involving dishonesty, * * *, or misrepresentation." In the other six causes on which we found Griffith guilty, he violated disciplinary rules in "conflict of interest" situations. A "selfish motive" or "greed" was a part of each of the conflict of interest violations.

(c) *A pattern of misconduct.* Yes. The pattern started in July 1980 and picked up speed during the last half of 1981 when Columbia Pacific and First Northwest began to fall apart. For the most part the causes of complaint alleged by the Bar were in chronological order and the largest number of the violations occurred in the latter third of the alleged complaints.

(d) *Multiple offenses.* Yes, in 10 separate causes.

(e) *Bad faith in disciplinary proceedings.* No. One of the lawyers for the Bar acknowledged in his opening statement before the Trial Panel that Griffith "completely cooperated" with the Bar.

(f) *Submission of false evidence, false statements, or other deceptive practices during the disciplinary process.* No, for the most part. However, on some occasions Griffith's answers were not truthful. For example, in the 34th cause, he testified that he had a sincere belief that he was worth $1,949,054 before taxes on his November 25, 1981 financial statement.

(g) *Refusal to acknowledge wrongful nature of conduct.* It has been difficult for Griffith to admit his fault in this proceedings. He has constantly maintained that he did not intend to hurt anybody. He contends that he was "blind-sided" by Wolf—who was his law partner, friend and financial adviser.

(h) *Vulnerability of victim.* The failure of Columbia Pacific and First Northwest had a domino effect. Many people were hurt indirectly by the actions of Wolf and to a lesser degree by the actions of Griffith. By way of example, the Trial Panel in its opinion described what happened to some of the members of the Village Joint Venture in Medford:

> "The Underwoods and Boylans worked all their lives to acquire modest estates. They did not have the business sophistication required to understand or appreciate the risks incident to the investments and projects undertaken by the Medford group. Their involvement in the Medford Group resulted in the loss of their estates and they have had to seek employment at a time in their lives when they should be enjoying the rewards earned prior to retirement."

(i) *Substantial experience in the practice of law.* Griffith was admitted to practice in Oregon in 1968.

(j) *Indifference in making restitution.* We cannot say that Griffith is indifferent to making restitution. To the best of our knowledge, that subject has not been discussed and he contends that he is not guilty of all charges. However, the sums involved are so large that they would overwhelm the average individual.

Section 9.31 of the 1986 American Bar Association standards contains this definition:

> "Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed."

Section 9.32 then lists 13 "Factors that may be considered in mitigation." We will consider them in order.

(a) *Absence of prior disciplinary record.* No previous record.

(b) *Absence of a dishonest or selfish motive.* We have found above in the aggravating factors that a dishonest and selfish motive did exist.

(c) *Personal or emotional problems.* None have been brought to our attention.

(d) *Timely good faith effort to make restitution.* There is one example in the 28th cause where Griffith did refund $25,000 to the Medford people who had been members of the

Village Joint Venture. This was the cause in which Griffith was accused of dividing a legal fee with non-lawyers. We found him not guilty. It goes to show that at least in some circumstances Griffith attempted to do the "right thing." Our reaction is that given the opportunity, Griffith would attempt to make restitution to individual people who were hurt but not to corporations, banks or government agencies like FDIC.[32]

(e) *Full and free disclosure to disciplinary board or cooperative attitude toward proceedings.* Good disclosure and cooperation as noted above regarding 9.22(e).

(f) *Inexperience in the practice of law.* Admitted in 1968.

(g) *Character or reputation.* Excellent. We accept the following uncontradicted statement in Griffith's brief in this court:

> "During his 18 years in practice, C. Anderson 'Andy' Griffith has established a reputation for candor, integrity and honesty among his peers and in the courts. The witnesses testifying to his outstanding character include seven highly respected plaintiff's lawyers, four equally respected defense lawyers, two current circuit court judges, one retired circuit court judge, and many of his partners and former partners." (Footnotes omitted.)

(h) *Physical or mental disability or impairment.* None.

(i) *Delay in disciplinary proceedings.* None.

(j) *Interim rehabilitation.* None to our knowledge. Probably this factor does not apply.

(k) *Imposition of other penalties or sanctions.* None, except that probably some of the indebtedness has been reduced to civil judgments.

(l) *Remorse.* Although Griffith has difficulty admitting his guilt, we believe that he sincerely regrets what has happened and that he would not repeat the same conduct.

(m) *Remoteness of prior offenses.* Does not apply.

This is a sad case. A lawyer who had a fine reputation as a trial lawyer got outside his field. A combination of blind

---

[32] Griffith's self-prepared financial statement of August 5, 1983 showed that he owed FDIC $374,924 and four banks a total of $183,500.

faith in a partner whom he considered to be his friend and an expert in the financial field plus plain old-fashioned greed "did him in." It may be that Wolf was one who was selling the sack of rotten potatoes to the unsuspecting buyer, but Griffith had his foot on the scales. We have found him guilty of four causes involving dishonesty and six causes involving conflicts of interest.

Griffith is disbarred from the practice of law in Oregon. The Oregon State Bar shall have judgment against him for its actual and necessary costs an disbursements incurred herein. ORS 9.536(4).